ESTATE OF WILLIAM MANDELS, DECEASED, ESTELLE MANDELS, DISTRIBUTEE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4848–70, 6903–70, 8520–72, 8530–72.    Filed April 17, 1975.

[1] Cases of the following petitioners are consolidated herewith: Estate of William Mandels, Deceased, Mollie Hoffman, Distributee, docket No. 6903–70; Estelle Mandels Smith, Transferee, docket No. 8520–72; and Mollie Hoffman, Transferee, docket No. 8530–72.

*Gerald Rubin,* for the petitioners.

*Marion L. Westen, Warren W. Dill,* and *William Peltz,* for the respondent.

FORRESTER, *Judge:* Respondent has determined that petitioners are liable, as transferees, for the following deficiency in gift tax and addition to tax of the Estate of William Mandels who died on January 11, 1966.

| Deficiency | Sec. 6651(a)[2] addition |
|---|---|
| $42,921.25 | $10,730.31 |

Some of the facts have been stipulated and are so found.

Petitioner Estelle Mandels Smith (petitioner, Smith, or Estelle) resided in Jamaica, N.Y., at the time the petition in docket No. 4848–70 was filed, and she resided in Long Beach, N.Y., at the time of the filing of the petition in docket No. 8520–72. Petitioner Mollie Hoffman was a resident of Massapequa, N.Y., on the dates her petitions were filed.

On April 9, 1962, William Mandels (decedent), an officer and director of both Solar Building Corp. (Solar) and Chesbrook Realty Corp. (Chesbrook), made a transfer in trust of his entire one-third stock interest in such corporations to his children, Leslie Mandels (Leslie) and Mollie. Pertinent provisions of the

---

[2] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

trust instrument which was executed in New York, N.Y., are as follows:

1. The Trustor simultaneously with the execution of this agreement, agrees to and does hereby transfer and deliver to the aforesaid Trustees and Cest que trusts, to wit: Leslie Mandels and Mollie Hoffman, in equal amounts, the shares of stock hereinbefore described and set forth, IN TRUST, nevertheless, as hereinafter set forth.

2. The Said Trustees and Cest que trusts, Leslie Mandels, Mollie Hoffman, Estelle Mandels [petitioner Smith, Leslie's spouse] and Harry Hoffman [Mollie's spouse], hereby agree, irrespective of the fact that they may and are hereby permitted to transfer the said shares of stock into their names on the books of the said corporations, to hold the said shares of stock IN TRUST, for the sole use and benefit of the Trustor, during the lifetime of the Trustor, and only after the death of the Trustor; the said Trustees and Cest que Trusts, shall become the absolute and definitive owners of the said shares of stock.

3. During the lifetime of the Trustor, he shall be entitled to receive, without deduction of any kind, except for taxes as may be required by law, all the benefits, emoluments, dividends, payments, of every kind and nature that shall accrue or be paid by reason of the ownership of the said shares of stock and the said Trustees and Cest que trusts agree to arrange to have the said benefits, emoluments, dividends and payments as aforesaid, paid directly to the Trustor by the said corporations during his lifetime and to deliver and pay over to the Trustor any such payments aforesaid, that they may receive from the said corporations, in the event such payments be made to them and not to the Trustor.

4. Should Leslie Mandels pre-decease the Trustor, Estelle Mandels shall succeed to the said shares of stock as now transferred to Leslie Mandels and to all rights therein, subject, however, to all the terms of this agreement of Trust.

5. Should Mollie Hoffman pre-decease the Trustor, Harry Hoffman shall succeed to the said shares of stock as now transferred to Mollie Hoffman and to all rights therein, subject, however, to all the terms of this agreement of Trust.

6. During the lifetime of the Trustor, the said Trustees agree, that although the said shares of stock may be in the names of the said Trustees, to vote the said shares of stock in such manner as the Trustor William Mandels shall direct and instruct to vote.

7. During the lifetime of the Trustor, the Trustees agree not to vote the said stock or to take any steps whatever, to remove or displace the Trustor as an officer, director and employee of the said corporations, nor to interfere with or object to the payment to him during his lifetime of salaries and wages paid to him from the said corporations.

8. During the lifetime of the Trustor, the Trustees agree not to sell, transfer, pledge, encumber nor hypothecate the said shares of stock, nor to take any actions or proceedings with respect to the said shares of stock but to continue during the lifetime of the Trustor to hold the said shares of stock in their names IN TRUST, solely and only for the use and benefit of the Trustor as herein set forth.

9. During the lifetime of the Trustor, the Trustees will in no way interfere with the powers and duties of the Trustor as an officer, director and employee of the said corporations; said Trustees will always vote the stock to retain the Trustor as an officer, director and employee of the said corporations and will in no way interfere or prevent the Trustor from acting as a required signatory on all the bank accounts of the said corporations and the Trustor will be allowed to continue during his lifetime to be active in the management of the said corporations in every respect, as prior to the execution of this agreement and transfer of the said shares of stock and the Trustees will cooperate in every way with the Trustor in order that the Trustor may be able to effectively function as aforesaid.

10. The Trustees agree to hold IN TRUST, for the sole benefit of the Trustor, any dividends, stock or otherwise, they may receive from the corporations, all as set forth in this agreement.

11. In the event, all the said Trustees and Cest que trusts, shall pre-decease the Trustor, all the shares herein transferred shall revert to the Estate of the Trustor; in the event one of the Trustees and Cest Que trusts and his or successor [sic] shall both predecease the Trustor, the said shares of stock given to the said Trustee and Cest que trust and his or her successor, shall revert to the Trustor.

On February 21, 1962, consents to these transfers were obtained by decedent from the other shareholders of Chesbrook and Solar. Such consents were required because agreements dated September 1, 1958, and signed by Mandels and the other two shareholders of Solar and Chesbrook prohibited sales of such stock by any of the three shareholders—each of whom had identical one-third stock interests in both corporations. Such agreements were to terminate in 5 years, and there is no evidence that they were renewed after the 5-year period had run in September of 1963. On May 16, 1962, each corporation issued a certificate indicating that Leslie and petitioner Hoffman were the owners of 16⅔ shares of stock in each corporation. There was no mention of the April 9 trust agreement on such certificates.

The same day on which the above-described trust agreement was signed, decedent made outright gifts to Leslie of 2 shares of 63 Rego, Inc. (63 Rego) stock, and of a 50-percent interest in funds owed decedent by 63 Rego. Decedent made identical gifts to petitioner Hoffman on the same day.

Just prior to his death, in late December of 1963, Leslie made two conveyances to his wife, Estelle. He transferred to her his 50-percent interest in the amounts owed decedent by 63 Rego. What the amount of such loan was on the date of the transfer is not disclosed in the record before us. Also transferred to Estelle were

the 8⅓ shares of Solar and Chesbrook stock which were held under the 1962 trust agreement. As provided by article 4 of the agreement, Estelle succeeded to Leslie's interest in the trust immediately upon his death. The record is silent as to what became of the 2 shares of 63 Rego stock which Leslie received from decedent in April of 1962.

On October 15, 1965, Solar agreed to sell its only asset—an apartment building in New York City—to Swellington Realty Corp. (Swellington) and the 590 Corp. (590). The purchase price was $450,000, an amount which included the assumption of certain debts of Solar. On the same day Chesbrook contracted to sell its only asset—also an apartment building in New York City—to the same two above-mentioned corporations. The sale price was $385,000, which again included the assumption of certain debts of Chesbrook by Swellington and 590.

Between the time of the signings of these agreements and the actual closings which occurred on January 31, 1966, decedent was involved in an auto accident, the injuries from which resulted in his death on January 11, 1966. On decedent's Federal estate tax return, the following item valued at $195,158.52 was included in the gross estate:

Net proceeds receivable from trust between William Mandels, decedent, Trustor and primary beneficiary, and Lester [sic] Mandels, now deceased and died prior to William Mandels, who was succeeded by Estelle Mandels; and Mollie Hoffman, Trustees and residuary beneficiaries.

This amount represented the trust's allocable share of the proceeds of the above-described sales.[3] Also listed on the return were $300 of other assets.

On May 10, 1967, Mollie filed a gift tax return for decedent with the District Director's office in Brooklyn. Such return listed four gifts from decedent to his children, all such gifts described as having been made on April 9, 1962. Two of the gifts were the shares of stock in 63 Rego, which were given to Mollie and Leslie. Each of such 2-share gifts was valued at $14,941.67. Also included were the two 50-percent interests in the amounts owed decedent by 63 Rego, one such interest given to Mollie, the other to Leslie. Each of these respective gifts was valued on the return at $11,750.

---

[3] Solar formally dissolved sometime in 1967, Chesbrook in late 1966.

In notices of liability mailed on April 27, 1970, to Estate of William Mandels, Estelle Mandels, distributee, and to Estate of William Mandels, Mollie Hoffman, distributee, respondent asserted deficiencies in gift tax in connection with the 1962 transfers by "the above-named donor." Respondent first determined that decedent had made a taxable gift of a $175,028.49 remainder interest to petitioners and their spouses by virtue of the 1962 trust. He also determined that the value of 2 shares of stock of 63 Rego, on April 9, 1962, was $20,920.56, and not $14,941.67 as described in the gift tax return. On the same day, respondent mailed a notice of deficiency to the administratrix of decedent's estate, but apparently the estate has filed no petition with this Court.

On August 28, 1972, respondent issued notices of liability to Estelle Mandels Smith, transferee, and Mollie Hoffman, transferee. Such notices described the same deficiencies in gift tax which had been determined against the Estate of William Mandels as had been described in the April 1970 notices. These notices of liability stated that petitioners were liable as donees and transferees of decedent.

In answers filed in docket Nos. 8520–72 and 8530–72, and in amended answers filed in docket Nos. 4848–70 and 6903–70, respondent asserted, as an alternate position, that the trust agreement alleged to have been signed on April 9, 1962, had in reality been signed sometime in 1965, and that the transfers of the Solar and Chesbrook stock to petitioners and their spouses in 1962 had been outright transfers not made in trust. Because, according to respondent's alternate position, decedent is not deemed to have retained any interest in such shares, respondent determined that the properly includable value of such gift was $196,793.89.

In all the notices described above respondent also asserted that petitioners were liable as transferees for section 6651(a) additions to tax because of the untimely filing of decedent's gift tax return.

OPINION

On April 9, 1962, decedent transferred in trust to his children, petitioners Hoffman and Leslie, one-third stock interests in two corporations. On the same day he gave each child 2 shares of stock in 63 Rego, as well as a 50-percent interest in sums of money

owed him by such corporation. In a gift tax return filed some 5 years after these transfers, and after decedent's death, there was no mention of the transfer in trust. Respondent contends that the transfer in trust constituted a taxable gift of a remainder interest under the trust and that the other gifts described above were undervalued on the return. It is respondent's position that the petitioners in this case are liable as transferees for the above-described deficiencies in decedent's gift taxes.

The first question to which we address ourselves is whether there are, in fact, deficiencies in the gift taxes of decedent because of the various transfers in 1962. As to this issue petitioners have the normal taxpayer burden of proof. Sec. 6902(a); Rule 142(d), Tax Court Rules of Practice and Procedure.

In order for a transfer to constitute the making of a taxable gift, there must be a cessation of the transferor's dominion and control over the item or items which comprise the subject matter of the transfer. *Estate of Sanford v. Commissioner,* 308 U.S. 39, 43 (1939); sec. 25.2511–2(b), Gift Tax Regs. If after the transfer has been made the donor possesses an unfettered power to revest the subject matter of the transfer in himself, the transfer will be deemed incomplete and no gift tax liability will result. *Burnet v. Guggenheim,* 288 U.S. 280, 283–286, 289–290 (1933); *Estate of Sanford v. Commissioner,* 308 U.S. at 43–44; *Marguerite F. Schwarzenbach,* 4 T.C. 179, 184, 185 (1944); *S. E. Brown,* 52 T.C. 50, 66 (1969); sec. 25.2511–2(c), Gift Tax Regs.; Rev. Rul. 54–537, 1954–2 C.B. 316. We find that the 1962 trust was revocable by decedent in his own discretion, and that hence such transfer did not constitute the making of a taxable gift.

In New York when, as in the instant case, a trust instrument itself contains no express provision as to revocability, the courts will look to all the provisions of the trust in order to determine whether or not it was the intent of the settlor, despite the silence of the instrument as to this matter, to reserve a power of revocation. *Warren v. Cropsey,* 51 Misc. 2d 399, 273 N.Y.S. 2d 257, 260 (Greene County Sup. Ct. 1966), affd. 29 App. Div. 2d 290, 287 N.Y.S. 2d 944 (3d Dept. 1968). In making a determination as to what was the intent of the settlor, the courts have generally looked at four factors relating to the transfer: (1) Whether the settlor has made a full and formal disposition of the property; (2) whether he reserved any power to grant or assign an interest in the trust during his lifetime; (3) whether he surrendered all

control over the property except the power to dispose of it by will; and (4) whether he has made any provision for the return of any part of the property to himself during his lifetime without the need to obtain permission from the trustees. *Richardson v. Richardson,* 298 N.Y. 135, 81 N.E. 2d 54, 56–58 (1948); *Application of Robinson,* 37 App. Div. 2d 753, 323 N.Y.S. 2d 219, 220 (4th Dept. 1971). The courts will weigh all such factors in making a decision as to the settlor's intent. *In re Burchell's Estate,* 299 N.Y. 351, 87 N.E. 2d 293, 297 (1949).

In the instant case we do not think the decedent surrendered all control over the shares of stock. Under article 6 of the trust, decedent specifically retained the right to tell the trustees how to vote the shares of stock. Furthermore, under articles 7 and 9, the trustees agreed not to act in any way in dealing with the stock which would in any manner jeopardize decedent's status as an officer, director, employee, and required signatory on all bank accounts of both corporations. In effect these provisions gave decedent as complete freedom to deal with and for the corporation as he had before the trust transfer in 1962. The trustees in addition were specifically denied the right "to sell, transfer, pledge, encumber * * * hypothecate * * * nor to take any actions or proceedings with respect to the said shares of stock." The inability of trustees to deal freely with trust corpus is one indication that the settlor did not intend the transfer to be irrevocable. Cf. *Berlenbach v. Chemical Bank & Trust Co.,* 235 App. Div. 170, 256 N.Y.S. 563 (1st Dept. 1932), affd. per curiam 260 N.Y. 539, 184 N.E. 83 (1932); *In re Glorney's Estate,* 109 N.Y.S. 2d 898, 908 (N.Y. County Sup. Ct. 1951).

We think that factor (4) described above (return of corpus to settlor) also points to the revocable nature of this trust. Under article 3 it is apparent that not only would decedent receive any dividends payable with respect to the stock, but, in addition, would receive any redemption or liquidation proceeds. Indeed, were it not for the fortuity of decedent's death before the closing of the Solar and Chesbrook sales and the eventual liquidation of these corporations, he probably would have received his allocable share of the sale proceeds, thus effectively terminating the trust. Thus, there were no assurances whatsoever at the outset, in 1962, that any of the beneficiaries, except for the decedent, would receive anything under the trust.

Such provisions of the trust agreement furthermore weigh against any finding of a full and formal disposition of the property—factor (1) above. Until the date of his death, decedent held virtually all the significant incidents of ownership of the stock. It is true that by entering into the trust agreement, he at least formally terminated his own right to sell the shares at will. However, such right does not here appear to be a particularly significant one. The corporations were closely held, and shareholder agreements prohibited sales (at least in the absence of consents from the other stockholders) until at least September of 1963. Thus the stock itself was not clearly marketable, and we think that the rights to dividends, redemption and liquidation proceeds, and the right to vote, all of which decedent retained, are more important factors to be considered in determining where the true ownership of the shares lay.

Considering the numerous rights which decedent retained in respect of the stock, it appears that his children, in a practical sense, received nothing from decedent as to such shares until his death in early 1966. Under all the facts described above, we think that a New York court would find that the 1962 trust was fully revocable by decedent. Since in effect we think he retained a power of revocation, we can find no completed gift to have been made in 1962, and hence no gift tax owing as to the trust transfer.

In answers or amended answers filed in each of the dockets in the instant case, respondent determined as an alternate position, that the transfer in 1962 was an outright transfer of decedent's entire interest in Solar and Chesbrook and not one made subject to a trust agreement. Thus, because under this position he was requiring that the entire value of the shares (and not only the value of decedent's children's alleged remainder interests) be included as taxable gifts, he was thereby determining increased deficiencies in gift taxes for which petitioners, according to respondent, would be liable as transferees. It follows that it is respondent's burden of proof to show the correctness of these increased deficiencies. *Estate of Tony Cordeiro*, 51 T.C. 195, 203 (1968); Rule 142(a), Tax Court Rules of Practice and Procedure.

To sustain his determination of increased deficiencies respondent relies on a testing of the inks used to sign the trust agreement, such testing having been conducted by the national office laboratory of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service. Basically, this testing may be

divided into two parts. In the first part, respondent's agents, by means of certain techniques of chemical analysis, identified the various chemical components of each of the inks involved. After having so identified such components, the combinations were compared to component formulas contained in respondent's "ink library," basically an extensive collection of various inks, each of which is described not only in terms of the actual components, but also in terms of when such particular combination of components supposedly first became commercially available. In the instant case, respondent argues that the particular type of ink used for decedent's, Leslie's, Mollie's, and Harry Hoffman's signatures on the trust agreement matched a sample in the ink library which, according to the information which identified the sample, was first commercially available in 1965. The ink used in the signing of Estelle's name compared with an ink in respondent's library which was first commercially available in 1963.

Thus, according to respondent, his testing of the inks shows that the trust agreement was backdated, because it could not have been finally executed until sometime in 1965. However, because the Solar and Chesbrook stock transfer certificates, together with the required shareholders' consents—all dated as having been signed in 1962—were all signed utilizing inks actually available in 1962,[4] these shares of stock, respondent asserts, must have been given outright by decedent to his children in 1962.

We reject respondent's alternative position because we cannot find that he has shown to our satisfaction that the trust agreement was actually executed subsequent to the date indicated on the instrument itself.

As is clear from the testimony of respondent's expert witness, a complete library of inks commercially available at any given time is of utmost importance for a successful ink identification. To the extent that such a library is not complete, the fact that a particular ink sample is listed in the library as having become first commercially available in 1965, for example, becomes less probative on the question of whether it was not in fact available—but unknown to the respondent—before 1965. Basing our reasoning on what respondent's expert witness explained at

---

[4] Respondent also subjected these inks to the testing described above.

the trial, it appears that there are a number of troubling and unanswered questions as to the comprehensiveness of the library. In the first place, respondent's expert witness only testified that the library was complete "to approximately 1958" without in any way explaining what he meant by this description of completeness. Because the inks are identified in the library according to the year in which the particular chemical combination making up the ink was supposedly first available on the market, a reasonable interpretation of respondent's statement is that the library is complete as to all inks *first* manufactured in and after 1958. While his witness successfully explains that inks manufactured prior to 1950 could be easily identified as being so manufactured because of an entirely different type dye used in such period, he does not satisfy our curiosity as to inks first manufactured in the 1950 to 1958 period. The problem is clear. Had respondent a complete collection of inks as far back as 1950, he might find that an ink which in the present library is identified as being manufactured first in 1965 for example, may have really been first manufactured in the 1950–58 period. Respondent simply gives us no guidance as to why the apparent gap in his collections should not give us pause in considering the accuracy of his proposed identification.

Furthermore, respondent's witness admitted at trial that ink manufacturers are in no way required to report to him any new type of ink they may be producing. Thus, respondent must rely totally on voluntarily given information which he may receive through his calls to the manufacturers. The record simply gives us no help in determining what degree of comprehensiveness such a voluntary system might produce. We have no idea, for example, whether and to what extent the industry's competitive structure, or any particularly felt need among manufacturers to keep their formulations out of common knowledge, might effect their willingness to divulge information to the Government. In addition, respondent relies totally on a certain industry directory for providing him with a list of names of ink manufacturers whom he may contact. Again, respondent gives us no reason to feel confident that such directory does provide a comprehensive listing—whether, for example, certain companies, if indeed there are such, only peripherally or sporadically involved in ink manufacture would be picked up by such directory.

In addition to the problems outlined above as to the completeness of respondent's ink library, there is nothing in the record concerning the degree of acceptance which respondent's testing procedure may have achieved among other chemists or persons in related disciplines. Respondent's expert witness testified that he had received an award from the International Association for Identification for developmental work in the ink analysis field, but we are simply given no idea as to the level of development which ink analysis has attained at this time.

We are in entire agreement with the statement that "matters of factual proof must keep pace with developing scientific standards." *United States v. Wainwright*, 413 F. 2d 796, 802–803 (10th Cir. 1969), cert. denied 396 U.S. 1009 (1970). And it is certainly not to be inferred from our discussion above that we will not accept the results of scientific testing unless 100-percent accuracy is demonstrated. While what level of proof is needed is of course not susceptible to precise definition, we think it clear that at least in the instant case the combination of factors mentioned above renders us unable to accept respondent's testing procedure as having established that the trust agreement was backdated. Respondent's testing may indeed provide an accurate method of dating agreements. If so, however, it was respondent's burden in this case to satisfactorily explain his position and methods to us.[5] Certainly, we must give such burden an even closer scrutiny when, as in the instant case, an acceptance of respondent's position would in effect represent findings by us of highly fraudulent behavior on the part of petitioners and others.

Having held that the transfer in trust resulted in no taxable gifts, we next proceed to a consideration of respondent's determination that the values of the gifts of 2 shares of stock of 63 Rego, one such gift to Leslie, the other to petitioner Hoffman, were understated on decedent's gift tax return. Petitioners having presented no evidence to overcome the presumptive correctness of this determination, we uphold respondent's determination that the value of each such gift of 2 shares was $20,920.56, and not $14,941 as listed on the return.

---

[5] The problems we described above, which have forced us to reject the findings requested by respondent in this case, were also not dealt with in an article published by respondent's expert witness. Brunelle & Pro, "A Systematic Approach to Ink Identification," 55 J. Association of Analytical Chemists 823 (1972).

At trial petitioners argued for the first time that decedent's 1962 gift tax return was incorrect in listing the gifts of 50-percent interests in the loan to Rego as having been made on April 9, 1962. It became the petitioners' position that such gifts were made in 1961. We will not consider such issue raised for the first time at trial since it has not been properly pleaded. *J. William Frentz*, 44 T.C. 485, 491 (1965), affd. 375 F. 2d 662 (6th Cir. 1967); *Sicanoff Vegetable Oil Corp.*, 27 T.C. 1056, 1065–1066 (1957), and cases cited therein, revd. on another issue 251 F. 2d 764 (7th Cir. 1958); *Estate of Akos Anthony Horvath*, 59 T.C. 551, 556 (1973). We think that our refusal to consider this issue because of our pleadings rule is particularly proper in the instant case where the issue raised was a factual one and where as is clear from respondent's reaction at trial he was unaware of petitioners' position until the time of trial.

Finally, as to respondent's determination of section 6651(a) penalties, the gift tax return was filed over 5 years after the gifts in question were made—far beyond the date specified in section 6075(b)—and petitioners have introduced no evidence that such failure to timely file was "due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). Hence, we uphold respondent's determination of additions to tax under section 6651(a)(1).

Having now found that there are outstanding gift taxes and additions to tax owing by the transferor—the decedent in the instant case—the next issue becomes whether the petitioners are liable for such deficiencies as transferees. As to this matter, respondent must assume the burden of proof. Sec. 6902(a); Rule 142(d), Tax Court Rules of Practice and Procedure.

As for Estelle, respondent has no basis for asserting a transferee liability. Respondent first relies on section 6324(b), which provides in pertinent part:

(b) LIEN FOR GIFT TAX.—Except as otherwise provided in subsection (c), [not here relevant] unless the gift tax imposed by chapter 12 is sooner paid in full or becomes unenforceable by reason of lapse of time, such tax shall be a lien upon all gifts made during the period for which the return was filed, for 10 years from the date the gifts are made. *If the tax is not paid when due, the donee of any gift shall be personally liable for such tax to the extent of the value of such gift.* * * * [Emphasis supplied.]

It is respondent's position that Estelle was decedent's donee and that hence, pursuant to the above-emphasized language in section 6324(b), she is liable for the unpaid tax. Respondent, however,

has not shown that Estelle was in fact a donee as to any of the 1962 gifts. As we held above, the trust agreement resulted in no gift to Estelle or anyone, and the gifts of the 63 Rego stock and the loan were made to Leslie and Mollie.

Respondent also appears to be contending that we should hold Estelle liable for the deficiencies in decedent's gift taxes because she was a transferee of Leslie, who was decedent's donee as to the 63 Rego stock and the loan. This position does not avail respondent. As to the gift of 63 Rego stock to Leslie, there is no evidence that Leslie ever gave any of such stock to Estelle. And as to the gift of the 50-percent interest in the funds due from 63 Rego, respondent has failed to show the value of such item on December 16, 1963, the day Leslie transferred it to Estelle. The value of items received by a transferee—a term which includes donees, see section 6901(h)—sets the limit on his possible liability under both section 6324(b) and the general transferee provisions in section 6901. *Mississippi Valley Tr. Co. v. Commissioner*, 147 F. 2d 186, 188 (8th Cir. 1945), affg. a Memorandum Opinion of this Court; *Fred J. LaFortune*, 29 T.C. 479, 488 (1957), affd. 263 F. 2d 186, 194 (10th Cir. 1958); *Eileen J. Moran*, 45 T.C. 528, 530 (1966). As such, proof of value is an essential part of respondent's burden of proof in transferee cases. *Evelyn N. Moore*, 1 T.C. 14, 15 (1942), affd. 146 F. 2d 824 (2d Cir. 1945); *Melba Schuster*,[6] 32 T.C. 998, 1007 (1959), affd. 312 F. 2d 311 (9th Cir. 1962). Thus, since in the instant case respondent has presented no evidence as to value, we cannot hold Estelle liable for any of the outstanding deficiencies we have found above.

As to Mollie, it is clear from the record that she was decedent's donee in 1962 by virtue of the gifts of 63 Rego stock and the 50-percent interest in the loan. Thus, to the extent of the value of these two gifts, she is liable under section 6324(b) for any deficiencies in decedent's gift taxes resulting from gifts he made in 1962, including deficiencies arising because of gifts to Leslie. *Marguerite E. Baur*, 2 T.C. 1016, 1019 (1943), affd. 145 F. 2d 338, 339 (3d Cir. 1944); *LaFortune v. Commissioner*, 263 F. 2d

---

[6] While *Schuster* involved the companion provisions to sec. 6324(b) covering liability for estate taxes, sec. 6324(a)(2), these provisions have been interpreted in pari materia. See *Commissioner v. Chase Manhattan Bank*, 259 F. 2d 231, 256 (5th Cir. 1958), revg. on another issue 25 T.C. 617 (1955), cert. denied 359 U.S. 913 (1959); *Melba Schuster*, 32 T.C. 998, 1007 (1959), affd. 312 F. 2d 311, 315 n. 3 (9th Cir. 1962); *Equitable Trust Co.*, 13 T.C. 731, 737 (1949).

186, 194 (10th Cir. 1958), affg. 29 T.C. 479, 489 (1957). Petitioner does not contest that the gift of 63 Rego stock was worth at least $14,941.67, and the gift of the interest in the loan at least $11,750. Such combined values clearly exceed the deficiencies we have found above, and hence, Mollie is liable for the entire amount of the deficiencies so found.

Mollie makes a number of arguments in support of her position that she should not be held liable as a transferee for the deficiencies in gift taxes of decedent. She first contends that respondent's notices of liability to her were insufficient to give us jurisdiction as to the issue of her section 6324(b) liability. As to the notice of liability issued to her in April of 1970, she argues that such notice only determined deficiencies in the taxes of decedent's estate. We think this argument deserves little attention. The notice specified that the notice was issued to her as a distributee—a term which identifies her as a transferee by virtue of section 6901(h). And the notice informed her that notices had been issued to the estate's administratrix—the more likely individual to whom a notice of deficiency for an estate's taxes would be mailed.

As an alternative position, she asserts that if the 1970 notice did in fact properly raise an issue of transferee liability, it raised it only as to her liability as a distributee of decedent's estate, and not as to any liability which may have existed because of section 6324(b). To sustain her position, she relies on a number of cases, all of which we find to be distinguishable from the instant case. She first relies on the line of cases commencing with *Edward Michael*, 22 B.T.A. 639 (1931), affd. per curiam 75 F. 2d 966 (2d Cir. 1935), cert. denied 296 U.S. 579 (1935), and *Milk Bottle Exchange, Inc.*, 43 B.T.A. 33 (1940), which hold that a statutory notice of transferee liability does not, by means of an amendment to the pleadings, place in issue a petitioner's deficiencies as the original transferor. But what worried the courts in those cases was, among other factors, the statutorily posited difference between the "deficiency" of a transferor, and the "liability" of a transferee:

Section 280 distinguishes between "the liability, at law or in equity, of a transferee of property of a taxpayer" and "a deficiency in a tax." It provides that the former shall "be assessed, collected and paid in the same manner" as the latter. This serves to make the procedure similar, but the language clearly differentiates between a liability as transferee and a deficiency. Had Congress

intended the construction for which petitioner contends it would have been much simpler to have modified the definition of a deficiency to include such a liability. Instead we find it drawing a distinction. [*Edward Michael,* 22 B.T.A. at 643.]

In the instant case the petitioner in his capacity as a donee, as is true of him in his capacity as a distributee, is one who is liable as a "transferee" (see section 6901(h)), and both such liabilities are subject to the rules for assessment and collection contained in sections 6901 and 6902. *Evelyn N. Moore,* 1 T.C. at 15–16; *Mississippi Valley Tr. Co. v. Commissioner,* 147 F. 2d at 187–188. Respondent, in both cases, must sustain the burden of demonstrating petitioner's liability as a transferee,[7] and the statutory period for assessment is identical in both cases. Such circumstances make inapplicable the concerns we expressed in *Milk Bottle Exchange, Inc.,* 43 B.T.A. at 36.

Petitioner also relies on *Hulburd v. Commissioner,* 296 U.S. 300 (1935), but the holding of that case was that a notice of liability sent to an estate could not be utilized to hold one of the estate's legatees liable for outstanding deficiencies of the estate's transferor—a situation quite distinguishable from that involved in the instant case.

We think that the instant situation is within the ambit of those cases which hold that the respondent may, in amended pleadings or in certain cases at trial, specify reasons different from those noted in the statutory notice itself in an attempt to sustain the deficiencies or liabilities he has determined. *Irish v. Commissioner,* 129 F. 2d 468, 470 (3d Cir. 1942), affg. 43 B.T.A. 864 (1941); *Anderson v. Commissioner,* 156 F. 2d 591, 592 (2d Cir. 1946), affg. 5 T.C. 482 (1945); see *Estate of Akos Anthony Horvath,* 59 T.C. at 556. In the instant case, respondent's 1970 notice of liability attempts to hold petitioner liable as a transferee in her individual capacity as a distributee. By his amended answer in the case, respondent pointed to her liability, again as a transferee, but this time as the actual donee of the gift. We think that a too narrow reading of the term "taxpayer" in section 6212(a) would be required for us to hold that she was a

---

[7] In one case respondent has the burden of showing petitioner liable as a "distributee transferee," in the other, as a "donee transferee." Different elements of proof are, to be sure, involved, in demonstrating distributee as opposed to donee liability (see *Schuster v. Commissioner,* 312 F. 2d at 314–315; see and compare *Evelyn N. Moore,* 1 T.C. 14, 15 (1942), affd. 146 F. 2d 824 (2d Cir. 1945), with *Eileen J. Moran,* 45 T.C. 528, 530 (1966)), but in each case the burden is on respondent to prove all the necessary elements.

different taxpayer in these two capacities, both of which capacities as we have pointed out above pertain to an individual transferee liability. Thus, we think that respondent in the instant case could assert petitioner's liability as decedent's donee-transferee under the April 1970 notice of liability.

Because we have now decided that respondent's 1970 notice (and Mollie's petition in response thereto) has given us jurisdiction over Mollie's liability as a donee transferee, the fact that respondent's 1972 notice which clearly identified Mollie as a donee-transferee was issued beyond the limitations period will not affect the proceedings in the instant case as to the section 6324(b) issues presented.[8]

Finally, Mollie argues that even if she is liable as a donee-transferee for the deficiencies in decedent's gift taxes for 1962, she should not be held liable for the additions to tax determined against decedent under section 6651(a). She points out that both section 6324(b) and section 6901(a)(1)(A)(iii) only give respondent the ability to assert transferee liability against a donee as to the basic gift tax deficiency involved.

It is true that neither section specifically mentions additions to tax as coming within the ambit of a transferee's liability, but the short answer to this apparent dilemma is to be found in section 6659(a)(2), which provides:

(2) Any reference in this title to "tax" imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter.

---

[8] Sec. 6901(c)(1) provides that the period of limitation for assessment of transferee liability as to an initial transferee—which is Mollie's status in the instant case as the decedent's donee—expires "1 year after the expiration of the period of limitation for assessment against the transferor." Sec. 6901(c)(1). Decedent's gift tax return was filed on May 10, 1967, at which time the normal 3-year statute of limitations on assessment began to run. Sec. 6501(a). On Apr. 27, 1970, respondent caused a suspension of the running of such period by his issuance of a notice of deficiency to decedent's estate (see sec. 6503(a)(1)), such suspension continuing for only 150 days, however, because of the estate's failure to file a petition with this Court. See secs. 6213(a), 6503(a)(1). (Sec. 6503(a)(1) suspends the running of the period for the 90-day period during which respondent may make no assessment because of sec. 6213(a), and then goes on to suspend the period for an additional 60 days.) Thus, the period began to run again sometime in late September of 1970, and even allowing for both the additional year provided by sec. 6901(c)(1), and the approximately 3 weeks left to run as to the original 3-year period of limitations, it is clear that the period had run far before the issuance of respondent's notice in August of 1972.

Respondent was of the opinion that a 6-year, rather than a 3-year, statutory period was available to him pursuant to sec. 6501(e)(2). But our holding above that the transfer in trust did not constitute the making of a taxable gift effectively refutes any contention that there was an omission of items in the gift tax return which exceeded in amount 25 percent "of the total amount of gifts stated in the return," the prerequisite for applicability of the extended period of limitations in sec. 6501(e)(2).

Thus, the operation of section 6659(a)(2) is that language in sections 6324(b) and 6901(a)(1)(A)(iii) which imposes transferee liability on a donee as to the basic gift "tax," also imposes a similar liability as to any addition to tax determined against the transferor.

> *Decisions will be entered for the petitioners in docket Nos. 4848–70, 8520–72, and 8530–72.*
>
> *Decision will be entered under Rule 155 in docket No. 6903–70.*