LEE GIRCSIS AND CHARLOTTE GIRCSIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gircsis v. Commissioner
Docket No. 16408-89
United States Tax Court
T.C. Memo 1992-244; 1992 Tax Ct. Memo LEXIS 262; 63 T.C.M. (CCH) 2867; April 27, 1992, Filed *262 An appropriate order will be issued and decision will be entered under Rule 155. John Kennedy Lynch, for petitioners. Ernest D. DeFoy, for respondent. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Lee Gircsis
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651
6653(a)
6653
6653
6654(a)
6661(a)
(a)(1)
(a)(1)
(a)(2)
1978
$  7,251
$   586
$ 363
$  36
1979
10,349
1,764
517
259
1980
9,091
1,345
455
284
1981
5,612
1,337
$ 280
[1]
405
1982
13,250
3,202
663
[1]
1,236
$ 3,202
1983
15,619
3,766
781
[1]
913
3,766
1984
19,257
2,472
963
[1]
475
2,472
1985
8,608
892
430
[1]
132
892
Charlotte Gircsis
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6651
6653(a)
6653
6653
6654(a)
6661(a)
(a)(1)
(a)(1)
(a)(2)
1980
$  2,261
$   143
$ 113
$   9.75
1981
3,162
148
$ 158
[1]
1983
6,797
1,008
340
[1]
204.53
$ 1,008
1984
11,942
1,468
602
[1]
273.69
1,468
1985
9,826
1,007
492
[1]
147.70
1,007
*263 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions and stipulations between the parties, the issues remaining for decision are: (1) Whether petitioners engaged in their horse breeding, stabling, and training activities with the requisite profit objective under section 183; (2) whether petitioners are entitled to a loss on the sale of a "barn"; and (3) whether petitioners are liable for additions to tax. FINDINGS OF FACT Some of the facts and certain documents were stipulated for trial pursuant to Rule 91. Unless otherwise indicated, the stipulated facts are found and incorporated into this Opinion, irrespective of any restatement below. At the time petitioners filed their petition, they resided in Columbia Station, Ohio. Petitioners have been married since 1976. Petitioners failed to file Federal *264 income tax returns for taxable years 1978 through 1985. On April 3, 1989, respondent issued separate notices of deficiency to each petitioner. On October 25, 1990, petitioners filed joint Federal income tax returns complete with signatures for taxable years 1978 through 1985. Sometime prior to October 25, 1990, however, petitioners submitted to respondent unsigned joint Federal income tax returns dated September 16, 1990, covering taxable years 1983 through 1985. During taxable years 1980 through 1985, petitioner Charlotte Gircsis (Mrs. Gircsis) worked full time as a pipefitter. During the taxable years in issue, petitioner Lee Gircsis (Mr. Gircsis) worked full time as a pipefitter. Mrs. Gircsis has been interested in horses since the early 1970's. In 1972, she purchased a stallion, Ken Mar Invader, for $ 850 and, in 1974, she purchased a mare, Little Bo Peep, for $ 650. During 1976, petitioners purchased another horse, Devan Reef, for $ 270. During the 1970's, petitioners believed that becoming involved in breeding, training, stabling, and showing horses would be a good way to supplement their pipefitting income. For approximately 1 year during the 1970's, in exchange for *265 room and board, petitioners worked on an Oklahoma horse farm to learn about stable management, feeding programs, and horse training. Additionally, while they were in Oklahoma, petitioners observed horse breeding and helped teach riding lessons. Petitioners selected the farm based on the owner's good reputation. During the time petitioners worked on the horse farm, Mr. Gircsis occasionally worked as a pipefitter. During 1978 and 1979, after returning from Oklahoma, petitioners rented a barn for their horses because they did not own any such facilities. Petitioners owned four horses during 1978 and three horses during 1979. During that time, Mr. Gircsis was working full time as a pipefitter, so the majority of the responsibility for the horses fell upon Mrs. Gircsis, who spent approximately 4 hours a day caring for the horses. Mr. Gircsis, however, assisted in the care of the horses after work and on the weekends. During 1980, petitioners moved to Fairport, Ohio. As petitioners still did not own any horse facilities, they rented stalls at the Lake County Fairgrounds for their horses. Subsequently, Mrs. Gircsis began working as a full-time pipefitter. Because petitioners were *266 both working full time, they cared for the horses in the early morning and after work each day. During 1981, petitioners purchased a house in Madison, Ohio, for $ 69,000. In 1982, petitioners began building a barn on the property. Petitioners sold the Madison, Ohio, property during 1985 for $ 72,000 in order to purchase property which had appropriate facilities for their activity, such as an indoor arena, several barns, and 10 acres of land. At the time the Madison, Ohio, property was sold, the foundation was the only part of the barn that had been completed. Petitioners maintained a partial, handwritten list of expenditures made for building the foundation. During the taxable years in issue, petitioners purchased six additional horses, three of which were eventually sold during such period. Of the three horses that were sold, one sold for a $ 700 profit, another sold for a $ 175 profit, and petitioners' records do not clearly reflect the profit on or price for which the third horse was sold. Petitioners bred their mares and, although the breeding was not always successful, their mares produced eight foals between 1976 and 1985. Two of the eight foals eventually were sold *267 during the taxable years in issue; one sold for $ 2,000 when it was 3 years old and the other sold for $ 1,200 during the year in which it was born. During 1985, Ken Mar Invader died. At various times during the taxable years in issue, petitioners owned no fewer than three horses and no more than 11 horses. During the taxable years in issue, petitioners bred their mares to their stallion, Ken Mar Invader, and to stallions owned by other people. During 1981, petitioners sent three mares to Brown's Hoss-pitality Stables (Brown's) to be bred to Waseeka's Moonshot, a three-time world champion. Before selecting Waseeka's Moonshot, petitioners consulted the stables' owner on stallion selection and, in the selection process, considered such factors as breeding qualities, bloodlines, market value of offspring, and salability of offspring. Petitioners wanted to obtain a foal that could be sold for a profit. Of the three mares sent to Brown's in 1981, only one mare produced a foal. In 1982, petitioners bred two of the three mares a second time to Waseeka's Moonshot and again only one mare produced a foal. Neither of the two foals sired by Waseeka's Moonshot were sold during the taxable *268 years in issue. Petitioners operated under the name Fox-Lee Farm. Petitioners' only record of their horse-breeding activity is a notebook containing pages of ledger paper on which petitioners made notes concerning their horses. Petitioners noted when the horses were purchased or sold; what price was paid or obtained; when the horses were bred; and whether a live foal was born. The record does not contain a general ledger, and the only two receipts in the record are for 1983 and 1984 yellow pages advertisements. During 1982, petitioners had stationery printed for the farm. During 1984, petitioners first joined the Morgan Horse Breeders Association, an association which exists for the purpose of promoting Morgan horses and serving breeders. During 1985, petitioners occasionally advertised services available at Fox-Lee Farm by means of flyers they had printed. The first year petitioners boarded horses was 1985. Petitioners trained horses for their own purposes during taxable years 1980 through 1985. During those years, however, petitioners trained only one horse for payment in 1985. Petitioners' stallion earned no stud fees during the taxable years in issue. Of the horses *269 petitioners owned during the taxable years in issue, only two horses were shown occasionally during that time. Petitioners' adjusted gross income for taxable year 1978 was $ 27,939, and petitioners had no itemized deductions for taxable year 1978. During taxable year 1979, petitioners received wages of $ 39,107 and unemployment compensation of $ 167, and paid child and dependent care expenses of $ 1,114. Petitioners, however, had no itemized deductions for taxable year 1979. During taxable year 1980, petitioners received wages of $ 42,856. Petitioners paid child and dependent care expenses of $ 1,347 and Schedule A expenses totaling $ 6,978. Petitioners are entitled to itemized deductions for theft loss in the amount of $ 3,804 and union dues in the amount of $ 774 for that year. During taxable year 1981, petitioners received wages of $ 38,615 and interest income in the amount of $ 21. Petitioners paid child and dependent care expenses in the amount of $ 941 and Schedule A expenses in the amount of $ 8,509. Petitioners are entitled to an itemized deduction in the amount of $ 940 for union dues. During taxable year 1982, petitioners received wages in the amount of $ 59,098, *270 interest income of $ 48, and unemployment compensation of $ 446. Petitioners paid child and dependent care expenses in the amount of $ 1,409 and Schedule A expenses of $ 11,350. Petitioners are entitled to an itemized deduction in the amount of $ 1,874 for union dues. During taxable year 1983, petitioners received wages in the amount of $ 72,288, unemployment compensation in the amount of $ 892, interest income of $ 17, and rental income of $ 3,895. Petitioners paid child and dependent care expenses in the amount of $ 1,967 and Schedule A expenses of $ 8,340. Petitioners are entitled to an itemized deduction in the amount of $ 2,006 for union dues. During taxable year 1984, petitioners received wages of $ 91,186.11, unemployment compensation of $ 4,287, interest income of $ 227, and rental income of $ 4,200. Petitioners paid Schedule A expenses in the amount of $ 14,815 and are entitled to an itemized deduction in the amount of $ 3,313 for union dues. During taxable year 1985, petitioners received wages in the amount of $ 56,376, unemployment compensation in the amount of $ 10,914, interest income in the amount of $ 41, and rental income in the amount of $ 4,200. Petitioners *271 paid Schedule A expenses in the amount of $ 13,537 and are entitled to an itemized deduction in the amount of $ 1,604 for union dues. On the delinquent returns petitioners filed on October 25, 1990, petitioners claimed the following Schedule F gross receipts, expenses, and net income or loss: Year
Gross Receipts
Expenses
Income (Loss)
1979
$ 2,000
$ 1,979
$       21 1980
-0- 1,542
(1,542)
1981
-0- 1,777
(1,777)
1982
-0- 8,352
(8,352)
1983
1,250
10,110
(8,860)
1984
-0- 8,405
(8,405)
1985
4,750
20,549
(15,799)
Total
$ 8,000
$ 52,714
$   44,714 Petitioners are entitled to an exemption for one child for taxable years 1978 through 1983 and exemptions for two children for taxable years 1984 and 1985. Petitioners did not pay any estimated tax payments for taxable years 1978 through 1985. OPINION Before we resolve the issues of the instant case, we consider a motion respondent made during trial, which we took under advisement. Respondent moved to exclude any evidence regarding petitioners' horse-breeding activities, contending that respondent would be surprised and prejudiced if petitioners were permitted to raise issues regarding petitioners' *272 entitlement to deductions from such activities for taxable years 1979 through 1985. Respondent made a similar motion with respect to an investment credit for taxable year 1985. Respondent contends that petitioners failed to inform respondent of petitioners' intention to claim such deductions and credit until October 25, 1990, just 4 days prior to the beginning of the trial session, when petitioners filed completed income tax returns with respondent for the taxable years in issue. At trial, however, respondent acknowledged that petitioners had submitted unsigned income tax returns to respondent for taxable years 1983 through 1985. The returns each contained a Schedule F claiming deductions relating to petitioners' horse-breeding activities. Respondent, therefore, had knowledge of petitioners' intention to claim horse-breeding deductions for taxable years 1983 through 1985. Accordingly, respondent agreed to conform the pleadings to the evidence under Rule 41(b) with respect to issues relating to petitioners' entitlement to deductions for their horse-breeding activities for taxable years 1983 through 1985. Respondent maintains an objection, however, with respect to the horse-breeding *273 activity deductions for taxable years 1979 through 1982 and the 1985 investment credit, as respondent was unaware of any claim to such deductions. Issues which are not properly pleaded will not be considered for the first time at trial. Rule 34(b)(4); Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975). Whether the opposing party has been given fair notice of an issue determines whether the issue has been properly raised. Rule 31(a); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). We must determine whether petitioners' action surprised and prejudiced respondent. Markwardt v. Commissioner, supra; Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973). We agree with respondent that she was surprised and prejudiced by petitioners' delinquent claims of horse-breeding deductions for taxable years 1979 through 1982 and investment credit for 1985. Petitioners failed to file timely income tax returns for all taxable years in issue, failed to assert claims of horse-breeding losses or an investment credit for any taxable year in their petition, and waited until 4 days prior to the beginning *274 of the trial session to file delinquent income tax returns which raised the horse-breeding issue for taxable years 1979 through 1982 and the investment credit for 1985 with respondent for the first time. As respondent has not been given fair notice of such claims, we will not consider them. We therefore grant respondent's motions. With regard to the substance of petitioners' claim for deductions from their horse-breeding activities for taxable years 1983 through 1985, respondent contends that petitioners did not engage in their horse-breeding activities with the requisite profit objective and that all of petitioners' claimed deductions should be disallowed pursuant to section 183. The general rule of section 183(a) disallows deductions attributable to an activity which is not engaged in for profit. Section 183(b), however, provides two exceptions to the general rule. The first exception, provided by section 183(b)(1), permits deductions that otherwise would be allowable without regard to whether "such activity is engaged in for profit", e.g., interest and State and local taxes. The second exception, provided by section 183(b)(2), permits deductions that would be allowable if *275 the activity were engaged in for profit to the extent "that the gross income derived from such activity for the taxable year exceeds the deductions allowable" under section 183(b)(1). An "activity not engaged in for profit" is defined in section 183(c)as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The proper standard for determining whether the activity is one which is engaged in for profit is whether the taxpayer engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's profit expectation need not be a reasonable one. Dreicer v. Commissioner, supra at 644-645; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.
Our decision regarding whether a taxpayer has an actual and honest profit objective must be based on all of the relevant facts *276 and circumstances. Dreicer v. Commissioner, supra at 645; Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. A taxpayer's declaration of profit objective is not controlling, as greater weight is given to the objective facts and circumstances than to mere statements of intent. Dreicer v. Commissioner, supra; sec. 1.183-2(a) and (b), Income Tax Regs. Petitioners bear the burden of proving that they engaged in their horse-breeding activities with an actual and honest profit objective. Rule 142(a); Golanty v. Commissioner, supra.
Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of relevant factors to be considered. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect *277 to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is conclusive, and all facts and circumstances including factors not listed are to be considered. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, supra; sec. 1-183-2(b), Income Tax Regs.
The record in the instant case does not convince us that petitioners engaged in their horse-breeding activities with an actual and honest objective of making a profit. The most glaring omission in the instant case is the very lax and unbusinesslike manner in which petitioners carried on their horse-breeding activities. Petitioners' records regarding their horses are inadequate and incomplete. Moreover, petitioners' records for the barn foundation built on the Medina, Ohio, property are incomplete. The record does not contain any general ledgers, accounting statements, or other records indicating the manner in which petitioners operated Fox-Lee Farm. Petitioners' certified public accountant (C.P.A.) testified that *278 petitioners had receipts, recaps, summaries, and activities books for the taxable years in issue, but inexplicably none of such records were offered at trial. Furthermore, the C.P.A. testified that he rarely examined receipts or invoices in preparing the income tax returns for taxable years 1979 through 1985 which petitioners delinquently filed with respondent on October 25, 1990. Moreover, petitioners' C.P.A. did not describe petitioners' recordkeeping methods in any detail. Consequently, we do not give the testimony of petitioners' C.P.A. much weight. Petitioners did not engage in any "consistent and concentrated" advertising which would be expected of an activity engaged in for profit. Golanty v. Commissioner, supra at 431. Petitioners merely listed Fox-Lee Farm in the yellow pages during taxable years 1983 and 1984 and printed a few flyers to advertise the services available at their farm during 1985. Petitioners did not show their horses more than occasionally and did not advertise in horse show programs, newspapers, or horse breeder's magazines. See Engdahl v. Commissioner, 72 T.C. 659, 667 (1979). Petitioners have not demonstrated *279 any plans or goals for Fox-Lee Farm and have not cited any changes made in their manner of operation to improve Fox-Lee Farms' profitability. Engdahl v. Commissioner, supra; sec. 1.183-2(b)(1), Income Tax Regs. Furthermore, although petitioners contend that the "barn" which they began to construct on their Medina, Ohio, property was necessary to their operation, during the 2 years which they owned the property, petitioners only completed the barn's foundation. Petitioners have not demonstrated that they have any significant expertise in the area of horse breeding for the taxable years in issue. Petitioners could cite only two times when they sought the advice of experienced persons. Although petitioners spent approximately 1 year in Oklahoma learning about stable management, feeding, and training, and consulted with the owner of Brown's Hoss-pitality Stables when they were interested in breeding three of their mares, we are not persuaded that such efforts qualify as extensive study. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners failed to seek any expert advice about methods they might utilize to become a profitable activity. Additionally, the record *280 does not show that petitioners consulted any experts about their purchases or the breeding of their mares with stallions other than Waseeka's Moonshot. See Engdahl v. Commissioner, supra at 668. Finally, petitioners did not become members of a professional organization until 1984, when they joined the Morgan Horse Breeders Association. Petitioners spent only a minimal amount of time and effort managing their horses. Both petitioners were employed full time as pipefitters during most of the taxable years in issue. Mrs. Gircsis testified that in 1979, prior to her employment as a full-time pipefitter, she spent approximately 4 hours a day working with the three horses they owned and that her husband would help during evenings and weekends, as he was then employed full time. Thereafter, when Mrs. Gircsis became employed as a full-time pipefitter, petitioners worked with the horses in the early morning and evening hours and weekends. Additionally, petitioners spent an insignificant amount of time showing their horses, as only two of petitioners' horses were occasionally shown during the taxable years in issue. Moreover, although petitioners claim that they *281 train and stable horses for profit, they could only point to one horse that they trained for remuneration in 1985, and Mrs. Gircsis testified that they did not board any horses for profit until 1985. Although petitioners claim gross receipts of $ 8,000 from their horse-breeding activities during 1979 through 1985, they have consistently incurred losses from their activities after 1979. The losses range from approximately $ 1,500 to $ 15,799. While the presence of loss in the early years of a horse-breeding business is not inconsistent with the desire to attain a profit, the goal is to realize a profit on the entire operation, "which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Although Mrs. Gircsis testified that a profit was expected in 1986, no evidence was introduced to substantiate such profit projections, and even if the operation had become profitable, the likelihood that petitioners would recoup the losses sustained through taxable year 1985 *282 from future years is not plausible. Finally, petitioners have given no explanation for such losses. Sec. 1.183-2(b)(6), Income Tax Regs.
Petitioners had substantial income from their full-time employment as pipefitters. Clearly, no benefit exists from losing money when the tax savings represent less than 100 percent of the loss. Engdahl v. Commissioner, supra at 670. Their substantial pipefitting income, however, permitted petitioners to continue their horse-breeding activities regardless of their losses and seek to have the Government subsidize a portion of the costs attributable to their activities. See Estate of Power v. Commissioner, T.C. Memo. 1983-552, affd. 736 F.2d 826 (1st Cir. 1984). Finally, although Mrs. Gircsis testified that petitioners' horse-breeding activities were not undertaken for pleasure and that she does not ride the horses for pleasure, but only to train them, we do not consider such testimony controlling. Based on the objective facts and circumstances of the instant case, we hold that petitioners have not carried their burden of proving that they engaged in their horse-breeding activities *283 for profit. Consequently, petitioners are not entitled to deductions for such activities, for taxable years 1983 through 1985. [1] Because petitioners did not prove that they engaged in their horse-breeding activities for profit, they are not entitled to their claimed ordinary loss on the "barn" expenditures. Moreover, petitioners have failed to adequately substantiate their basis in the barn. Consequently, petitioners are not entitled to any deduction for such loss. The only remaining issues for decision [2] are the additions to tax respondent determined in the notice of deficiency. Respondent, however, conceded on brief that petitioners are not liable for the additions to tax under section 6661(a) for any taxable year in issue. *284 With regard to the other additions to tax determined by respondent, however, petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners have neither offered evidence nor argued that they are not liable for such additions to tax. Consequently, petitioners have failed to carry their burden of proof and are liable for the additions to tax determined by respondent, other than the additions to tax under section 6661, conceded by respondent. To reflect the foregoing, An appropriate order will be issued and decision will be entered under Rule 166. Footnotes
1. 50 percent of the interest due on the deficiency↩
1. 50 percent of the interest due on the deficiency.↩
1. Although under sec. 183(b)↩ deductions are permitted to the extent of income, as respondent has not determined that petitioners had income from their horse-breeding activities during taxable years 1983 through 1985, petitioners are not entitled to such deductions.
2. Respondent has set forth arguments in her brief regarding additional issues about which petitioners have failed to put forth any evidence or arguments for our consideration. Consequently, we deem petitioners to have conceded the issues. See Theodore v. Commissioner, 38 T.C. 1011, 1041↩ (1962).