EDWARD D. ROLLERT RESIDUARY TRUST, GENESEE MERCHANTS BANK & TRUST CO., TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16418–79.    Filed March 31, 1983.

*Russell E. Bowers* and *Richard B. Covey*, for the petitioner.
*Beth L. Williams*, for the respondent.

OPINION

WHITAKER, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $83,795 for 1973; $68,686 for 1974; and $2,675 for 1975.

This case was submitted fully stipulated under Rule 122, Tax Court Rules of Practice and Procedure. The primary issues for decision are: (1) Whether rights to receive bonus payments under the General Motors bonus plan, which were attributable to an individual's employment with General Motors before his death but which were not formally awarded until several months after his death, are rights to income in respect of a decedent; and (2) whether rights to income in respect of a decedent which were distributed by the decedent's estate to petitioner in prior years acquired a basis in the hands of petitioner equal to their fair market value on the date of distribution. With respect to this second issue, we must specifically decide whether the rights to income in respect of a decedent were amounts "properly paid or credited" for purposes of sections 661(a)(2)[1] and 662(a)(2). The second issue applies to post-death installments of bonus awards made prior to death, concededly income in respect of a decedent, as well as the postmortem bonus awards (issue 1), if we determine issue (1) in respondent's favor.

On December 31, 1960, Edward D. Rollert, as settlor, and Genesee Merchants Bank & Trust Co., as trustee, executed a revocable trust agreement (hereinafter trust agreement). This trust agreement provided for the establishment of two separate trusts—a marital trust and a residuary trust—to administer assets owned by Mr. Rollert at death. The residuary trust is the petitioner herein. When the petition was filed, the principal place of business of the trustee was Flint, Mich.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

For several years prior to his death on November 27, 1969, Edward D. Rollert had been employed as an executive vice president of General Motors Corp. and had participated in the corporation's stock option plan and its bonus plan. These plans were designed to compensate corporate executives and other employees by providing cash and stock bonuses payable in installments in subsequent years. Amounts awarded under the plans were interrelated: if an employee was awarded a stock option bonus, any award under the bonus plan was reduced. All awards under the bonus plan for more than $2,000 were to be paid in cash or stock in annual installments over a 5-year period following the year of award. Bonuses under the stock option plan were in the form of contingent credits for General Motors stock. After the termination of stock options concurrently awarded to the executive, the contingent credits would entitle the executive to receive the stock. Like the bonuses under the bonus plan, the contingent credits under the stock option plan were credited in installments over a 5-year period. However, the period for applying the contingent credits started running from the date the options were terminated. Mr. Rollert's options terminated within 12 months after his death.

During the period between the award of bonus rights under either of these plans and the employee's receipt of the final installment payment attributable to such rights, the employee had to "earn out" his or her right to the award by continuing to be employed by the corporation and not committing acts inimical to the best interests of the corporation. Death relieved an employee from the duty of earning out a bonus; thus, upon an employee's death, his or her estate, or the party entitled to the right, possessed a nonforfeitable right to subsequent installments of the bonus award.

General Motors made awards to Mr. Rollert under both the bonus plan and the stock option plan for each of the years 1964 through 1968. These awards, which exceeded $300,000 for each of these years, are referred to collectively as the "lifetime bonus awards." When Mr. Rollert died on November 27, 1969, the remaining installment payments of these bonuses became nonforfeitable and payable to Mr. Rollert's estate.

Shown on page 623 is a copy of Joint Exhibit 6-F listing the

following information with respect to lifetime bonus awards made to Mr. Rollert:

(A) *Year of award determination.*—This shows the year in which the lifetime awards were determined.

(B) *Year of receipt.*—This shows the year in which installments of lifetime bonus awards were paid by General Motors and received by the Estate of Edward D. Rollert (hereinafter the estate) or petitioner. Lifetime bonus awards received in cash are so recorded; those received in stock are shown with the number of shares and the fair market value at delivery indicated.

(C) *Year of final installment.*—This shows the year in which the final installment of each lifetime bonus award was paid or delivered.

On March 2, 1970, decedent was awarded a bonus under the bonus plan of 1,786 shares of General Motors common stock and $285,763 cash with respect to his almost 11-months employment with the corporation in 1969. This is referred to hereafter as the "postmortem bonus award." The parties have stipulated that decedent "had no rights to the post-mortem bonus award during his lifetime." This bonus was to be paid in five annual installments, with the first installment in March 1970, and the subsequent installments on January 10 of the next 4 years. The installments for 1970, 1971, 1972, and 1973 each consisted of $57,168 cash and 357 shares of General Motors stock.[2] For 1974, the installment consisted of $57,090 cash and 358 shares of stock. No award was made to Mr. Rollert under the stock option plan with respect to his employment in 1969.

The procedures for awarding bonuses under the bonus plan to an executive vice president, such as Mr. Rollert, were the same as those with respect to other employees. The bonus plan stated that it was contemplated that bonuses would be awarded annually but that the committee had the right from time to time to modify or suspend the plan. Bonuses were awarded under the bonus plan in all the years 1956 through 1969, and it was the practice during this period to grant awards to all executive vice presidents.

---

[2] The fair market values of the stock when distributed were $25,258 for 1970; $29,408 for 1971; $27,935 for 1972; $29,497 for 1973; and $16,738 for 1974.

## INSTALLMENTS OF BONUS AWARDED DURING LIFETIME BUT PAID AFTER DEATH

| Year of award determination | Year final installment paid (Stock) | Year final installment paid (Cash) | 1970 Stock # Shs. | 1970 F.M.V. | 1970 Cash | 1971 Stock # Sh. | 1971 F.M.V. | 1971 Cash | 1972 Stock # Sh. | 1972 F.M.V. | 1972 Cash | 1973 Stock # Sh. | 1973 F.M.V. | 1973 Cash | 1974 # Sh. | 1974 F.M.V. | 1975 # Sh. | 1975 F.M.V. | Total Stock (#) | Total Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1964 | 1974 | --- | 222 | | --- | 223 | | --- | 222 | | --- | 223 | | --- | 223 | | --- | | 1112 | --- |
| 1965 | 1975 | 1970 | --- | | $61,500 | 183 | | --- | 184 | | --- | 184 | | --- | 184 | | 184 | | 919 | $61,500 |
| 1966 | 1975 | 1971 | --- | | 69,000 | 202 | | $69,000 | 202 | | --- | 203 | | --- | 203 | | 203 | | 1010 | 138,000 |
| 1967 | 1974 | 1972 | --- | | 66,750 | 260 | | 66,750 | 260 | | $66,750 | 259 | | --- | 259 | | 260 | | 1298 | 200,050 |
| 1968 | 1975 | 1973 | --- | | 73,500 | 278 | | 73,500 | 278 | | 73,500 | 278 | | $73,500 | 278 | | 278 | | 1390 | 294,000 |
| 1969 | 1975 | --- | 298 | | --- | 299 | | --- | 298 | | --- | 299 | | --- | 299 | | --- | | 7223 | --- |
| Totals | | | 520 | $45,250 | 270,750 | 1445 | $113,071.25 | 209,250 | 1444 | $118,949 | 140,250 | 1446 | $119,476 | 73,500 | 446 | $67,601 | 925 | $33,878 | 7223 | $693,750 |

[Discrepancies in the above Joint Exhibit were not addressed by the parties.]

The first step to be taken in each year in deciding whether to award bonuses under the bonus plan was for the corporation's independent public accountants to determine an amount to be set aside in a reserve to be used to pay any bonuses that might be awarded under the two plans. The amount set aside was computed under a formula based generally on the corporation's net earnings, but the corporation's bonus and salary committee (hereinafter the committee) had discretion to direct that a lesser amount be credited. For the year 1969, an initial determination of the amount available for payment of bonuses was made on October 6, 1969, approximately 1½ months prior to Mr. Rollert's death. This determination was reviewed monthly until February 2, 1970, when it was accepted as final.

The second step in awarding bonuses was the selection of eligible employees for awards under the bonus plan. To do this, the committee designated a monthly salary rate, and with a few exceptions, all employees earning in excess of that rate were considered for bonuses in that year. On November 3, 1969 (again prior to the date of death), the committee made a tentative determination of awards for all executive vice presidents, including Mr. Rollert. This determination was reviewed monthly until finalized on March 2, 1970. During the review on January 5, 1970, the committee decided to make an award on account of Mr. Rollert's service despite his death but reduced it to an amount roughly equivalent to $^{11}/_{12}$ths of the amount originally determined. This accorded with the committee's practice of prorating awards on the basis of the amount of actual service during the year. On March 2, 1970, the award for Mr. Rollert's 1969 service was formally made. It was for the amount determined on January 5, 1970.

The provisions of the bonus plan stated that an employee would be eligible for consideration for a bonus in the year his or her employment terminated, at the discretion of the committee and under such rules as the committee might prescribe. As of the date of decedent's death, the committee had prescribed no rules dealing with the awarding of bonuses to employees who had died during the award year; but it had been the committee's practice, generally, to treat eligible employees who had at least 2-months active service in the award year the same as employees not terminating their service. Thus, the committee would deny a postmortem award

to an employee with at least 2-months service in the award year only if his performance had declined to the extent that he would not have been given an award if he had lived, or if he had acted or conducted himself in a manner inimical or in any way contrary to the best interests of the corporation. None of these exceptions applied to Mr. Rollert.

Mr. Rollert did not report on his pre-death income tax returns any of the bonus awards at issue here. Nor were any of these amounts reported in Mr. Rollert's final individual income tax returns.

Mr. Rollert executed his last will and testament on March 14, 1961. After he died, this will was admitted to probate. The executor of the estate, Genesee Merchants Bank & Trust Co. performed the administration of the estate and filed the U.S. Estate Tax Return, Form 706, for the estate. This return included in the gross estate the date-of-death values of the installments of the lifetime bonus awards that had not been paid or delivered to Mr. Rollert as of the date of death, but it did not include the postmortem awards. The date-of-death values for both the stock and cash portions of the lifetime bonus awards were discounted values, reflecting the fact that the amounts were not to be delivered until future years.

The will made certain specific bequests of property, and devised the residue to the marital and residuary trusts created under the trust agreement. None of the rights to receive future installments of lifetime or postmortem bonus awards were subject to distribution as a specific bequest. All these rights to installments of bonus awards were administered as part of the residue of the estate and were subject to distribution to petitioner under the residuary clause of the will. The bonus plan and the stock option plan did not permit the assignment by a deceased employee's estate of the rights to receive future bonus installments except that the estate could transfer such rights to the party entitled to them as testamentary beneficiary or heir.

During the administration of the estate, the executor made five separate distributions to petitioner of certain of the rights to receive cash or stock due in subsequent years as installments of lifetime bonus awards, and a distribution of the right to the final installment due under the postmortem bonus award. These six distributions included a December 30, 1970,

distribution of the right to receive 1,446 shares of General Motors stock on January 10, 1973; a December 30, 1970, distribution of the right to receive $73,500 on January 10, 1973; a December 21, 1971, distribution of the right to receive 1,446 shares of General Motors stock on January 10, 1974; a December 22, 1972, distribution of the right to receive 925 shares of General Motors stock on January 10, 1975; a December 22, 1972, distribution of the right to receive $57,090 on January 10, 1974; and a December 31, 1973, distribution of the right to receive 358 shares of General Motors stock on January 10, 1974. Each distribution of a right to receive future bonus installments was made prior to the year in which payment or delivery of the installment was due.

To record these six distributions of the rights to receive bonus installments, the estate and petitioner each made book entries for deliveries or receipts of "accounts receivable." No other act of transfer occurred between the estate and petitioner.

Each of the distributions of the rights to future bonus installments was treated by the estate and petitioner in essentially the following manner. With respect to each right that was distributed, the present value of the right was determined as of the date of distribution. The estate claimed a distribution deduction for this amount on its U.S. Fiduciary Income Tax Return, Form 1041. Petitioner reported on its U.S. Fiduciary Income Tax Return, Form 1041, for the year of distribution the same value as gross income received from the estate. In each of the years in which rights to bonus installments were distributed, the estate had distributable net income, as defined in section 643, consisting primarily of bonus installments actually received by the estate in that year.[3] For each year, the amount of distributable net income exceeded the total of the correct date-of-distribution value of rights to future bonus installments plus the amount of cash distributions which were made in each of these years to the marital trust.

In the subsequent years, when the bonus installments were due, General Motors paid them directly to petitioner. Petition-

---

[3]The estate reported distributable net income on its income tax returns in the amounts of $450,562 for 1970; $420,915 for 1971; $376,895 for 1972; and $107,247 for 1973.

er reported on its income tax return as ordinary income only the amount, if any, by which the bonus installment paid to it by General Motors exceeded the corrected value of the right to the bonus installment as of the date the right was distributed to it.[4] Due to fluctuations in stock prices, two of the bonus installments had values lower than the bases previously assigned to the rights to these installments. Petitioner claimed no losses in these instances. The estate did not include in income any portion of the bonus installments that were paid directly to petitioner.

The following description of the treatment by the estate and petitioner of the stock portion of the distribution on December 30, 1970, illustrates how the distributions of the rights were treated. On December 30, 1970, the executor distributed to petitioner the right to receive future payment and delivery of the bonus installment of 1,446 shares of General Motors common stock which was payable and deliverable by General Motors to the estate on January 10, 1973. Both the estate and petitioner used $92,941 as the value as of December 30, 1970, of this bonus right. The estate claimed a distribution deduction of $92,941 on its income tax return, and petitioner reported $92,941 on its income tax return. The trustee subsequently made an adjustment on the books of petitioner to increase the reported present value of the right distributed to it as of December 30, 1970, from $92,941 to $108,242, which was the correct present value of the right as of December 30, 1970. On January 10, 1973, General Motors paid the installment due on that date by delivery of the 1,446 shares of common stock to petitioner. As of this date, the total fair market value of the 1,446 shares was $119,476. Petitioner reported on its 1973 income tax return $11,234 as a receipt of ordinary income. This amount represented the difference between the fair market value of the stock on January 10, 1973 ($119,476), and the corrected December 30, 1970, present value of the right to

---

[4]For three of the rights to bonus installments, petitioner used a different value than the amount it had reported on its income tax return in the year the right was distributed. This difference is due to the fact that the values initially determined and used on its returns were incorrect and were subsequently adjusted on petitioner's books to the corrected amounts. There is nothing in the record, however, to indicate that petitioner filed amended returns to correct its initial use on its Forms 1041 of incorrect values for the rights to future bonus installments that it received and treated as income.

receive the stock ($108,242). The estate reported no gain or income with respect to this payment either in 1973, when the installment of the bonus award was paid to petitioner, or in any other year.

Respondent examined petitioner's income tax returns for the years 1973, 1974, and 1975, and determined deficiencies in each of these years. When the notice of deficiency was issued to petitioner on September 6, 1979, petitioner had no right to file for refund with respect to the years 1970, 1971, and 1972. It has been respondent's position that the distribution of the rights to the lifetime and postmortem bonus installments were income in respect of a decedent, that receipt of these installments did not give petitioner any basis in these rights, and that petitioner therefore had to include as income the entire amount of each bonus installment when paid to it. In computing the amounts of deficiencies, respondent did not allow any deductions under section 691(c) for estate taxes paid with respect to the lifetime bonus awards. On brief, respondent concedes that to the extent petitioner must include in its gross income items of income in respect of a decedent, a deduction under section 691(c) should be allowed for the Federal estate tax paid with respect to such income. Respondent also states on brief that if the Court finds that the contested bonus installments were income in respect of a decendent, then the maximum tax rates under section 1348 will apply in computing the amounts of deficiencies owed by the petitioner.

## Characterization of the Bonus Payments as Income in Respect of a Decedent

The first question we must resolve is whether the bonus payments were income in respect of a decedent under section 691.

In its answering brief, petitioner for the first time suggests that installment payments of the contingent credits awarded under the stock option plan might not constitute income in respect of a decedent. However, in paragraph 6(1) of its amended petition, petitioner conceded that the rights to the installment payments of the lifetime bonus awards were rights to income in respect of a decedent, and the case was initially briefed by both parties on this basis. Petitioner cannot now

raise a new issue by arguing contrary to the conceded facts. See, e.g., *Sicanoff Vegetable Oil Corp. v. Commissioner*, 27 T.C. 1056, 1065–1066 (1957), revd. on another issue 251 F.2d 764 (7th Cir. 1958).

We are, however, squarely faced with the issue whether payments of the postmortem bonus award were income in respect of a decedent. Petitioner argues that Mr. Rollert had no right or entitlement to a bonus award with respect to his employment in 1969 since the bonus was not formally awarded by General Motors until March 2, 1970—over 3 months after his death. We disagree. For purposes of section 691, we believe that as of the date of his death, Mr. Rollert had a right to a bonus award for 1969, in view of General Motors' established practices in awarding bonuses and its tentative decisions to assign substantial funds to the bonus pool for 1969 and to award bonuses to all executive vice presidents.

Section 691(a) provides that gross income of an estate shall include all income in respect of a decedent, but nowhere in the Code is this phrase defined. The only definition appears in section 1.691(a)–1(b), Income Tax Regs.,[5] but this definition does little to clarify the meaning of the term. Thus, the courts have frequently been called upon to establish the dimensions of the term. *Estate of Peterson v. Commissioner*, 74 T.C. 630, 638 (1980), affd. 667 F.2d 675 (8th Cir. 1981).

In determining whether particular receipts should be treated as income in respect of a decedent, courts have focused on whether the decedent had a *right* or *entitlement* to receive income as of the date of his death. *Estate of Peterson v. Commissioner*, 667 F.2d at 679, and cases cited therein. The

---

[5] Sec. 1.691(a)–1(b), Income Tax Regs., provides:

(b) *General definition.* In general, the term "income in respect of a decedent" refers to those amounts to which a decedent was entitled as gross income but which were not properly includible in computing his taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent. See the regulations under section 451. Thus, the term includes:

(1) All accrued income of a decedent who reported his income by use of the cash receipts and disbursements method;

(2) Income accrued solely by reason of the decedent's death in case of a decedent who reports his income by use of an accrual method of accounting; and

(3) Income to which the decedent had a contingent claim at the time of his death.

See secs. 736 and 753 and the regulations thereunder for "income in respect of a decedent" in the case of a deceased partner.

parties have stipulated in this case that Mr. Rollert "had no rights to the post-mortem bonus award during his lifetime." Respondent takes the position that for purposes of the stipulation, the term "rights" should be read as referring to contract rights or other legally enforceable rights, and that the stipulation establishes only that the decedent had during his lifetime no legally enforceable right to an award not yet made. Petitioner contends, however, that the stipulation establishes that decedent had no right or entitlement to the postmortem bonus and that the installment payments of this bonus were therefore not income in respect of a decedent. We do not accept petitioner's view. Whether decedent had a right or entitlement to a bonus award for 1969 is a question of law, and it is well established that this Court may disregard a stipulation of law. *Mead's Bakery, Inc. v. Commissioner*, 364 F.2d 101, 106 (5th Cir. 1966), affg. on this point a Memorandum Opinion of this Court. This is particularly so when facts are presented, as they have been in this case, that conflict with the suggested interpretation of the stipulation. *Mead's Bakery, Inc. v. Commissioner, supra* at 106; *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976).

Petitioner relies on several cases that have applied the "right-to-income" or "entitlement" test in determining whether post-death payments constitute income in respect of a decedent. *Estate of Peterson v. Commissioner, supra; Halliday v. United States*, 655 F.2d 68 (5th Cir. 1981); *Claiborne v. United States*, 648 F.2d 448 (6th Cir. 1981); *Keck v. Commissioner*, 415 F.2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968); and *Trust Co. of Georgia v. Ross*, 392 F.2d 694 (5th Cir. 1967). We agree with petitioner that this test should be applied but find on the facts of this case that as of the date of his death, Mr. Rollert had a right or entitlement to a bonus for 1969.

*Keck v. Commissioner, supra,* and *Trust Co. of Georgia v. Ross, supra,* were the first cases to squarely reject reliance on the "economic activity" test under which the inquiry had been limited to consideration of whether the significant economic activity giving rise to income received after death had been performed prior to death. These two opinions indicated that all facts should be examined to determine whether at the date of death the decedent had the right to the post-death payments. *Trust Co. of Georgia* involved proceeds from the sale of

property pursuant to a binding contract which decedent had executed prior to death. Although there were a few aspects of the transaction not completed by the date of death, the court found that these were not of such a scope as would negate the right possessed by decedent under the contract. In contrast, the *Keck* court was presented with a situation in which the occurrence of post-death contingencies would defeat the existence of a right to income. The particular fact situation before the court in the *Keck* case involved the treatment of liquidation distributions from corporations in which decedent had owned stock. Prior to decedent's death, the corporations had agreed to sell their assets in pursuance of a contemplated liquidation, but the sale was not consummated until after the decedent's death. The Court of Appeals stressed that the sale of the stock was subject to a number of contingencies, such as prior Interstate Commerce Commission approval and the continued agreement of the majority shareholder. On these facts, the court found that decedent had neither the right nor the power to require the corporations to liquidate and thus did not possess, prior to his death, the right to receive any proceeds from the contemplated liquidation.

In *Claiborne v. United States, supra,* the right-to-income or entitlement test was applied in the context of the sale of property on which the decedent had granted an option prior to her death. Because the decedent had died before the optionee paid her the purchase price, the court recognized that she was not entitled as a strict matter of law to the full purchase price as of the date of her death. However, the court found that under State law the decedent had the right in equity to specific performance of the land purchase agreement at the full purchase price because the optionee had already taken full possession of the realty prior to the decedent's death. The *Claiborne* opinion holds that the right-to-income or entitlement test is satisfied when a decedent possesses as of the date of death a legal or equitable entitlement to income. It does not state, however, that the existence of a right enforceable at law or in equity is an absolute prerequisite to finding a pre-death entitlement to income.

These three appellate opinions left considerable room for disagreement over exactly what constitutes a right or entitlement to income. However, *Halliday v. United States, supra,*

and *Estate of Peterson v. Commissioner, supra,* have clarified this test.

In *Halliday,* the Fifth Circuit rejected the view that a legally enforceable right was necessary in order for income to be taxed under section 691. The court characterized the right-to-income test as simply a "more precise" definition of income in respect of a decedent, rather than as a repudiation of the line of cases that had found the existence of income in respect of a decedent in the absence of a legally enforceable right. It elaborated on the right-to-income test as follows:

We find that for purposes of Section 691, a right to income arises where the evidence shows a substantial certainty that benefits directly related to the decedent's past economic activities will be paid to his heirs or estate upon his death, notwithstanding the absence of a legally enforceable obligation. * * * [655 F.2d at 72.]

The fact situation in *Halliday* was quite similar to that now presented to us. The *Halliday* court was asked to decide whether section 691 applied to life insurance renewal commissions received by the estate of an insurance agent after his death. The agent had no contractual right to the payment of these renewal commissions. Nevertheless, the insurance company had a longstanding policy of paying benefits at a set rate to the beneficiaries of a deceased agent, and this policy had been embodied in corporate resolutions. On the basis of these facts, the court found that the decedent had a right, albeit not necessarily a legally enforceable one, to post-death renewal commissions, and therefore that the benefits paid to his estate by the insurance company constituted income in respect of a decedent.

The "substantial certainty" approach adopted in the *Halliday* opinion is consistent with the approach we took in *Estate of Peterson v. Commissioner, supra.* That case involved the tax treatment of sales proceeds under a contract for the sale of calves, which had been entered into by the decedent prior ·to his death. Based on our review of the case law and regulations, we found in *Estate of Peterson* that the following four requirements have been applied to test whether a decedent possessed the requisite right to sales proceeds at the time of death: (1) Whether the decedent entered into a legally significant arrangement regarding the subject matter of the sale; (2) whether the decedent performed the substantive acts required

as preconditions to the sale; (3) whether there existed at the time of decedent's death any economically material contingencies which might have disrupted the sale; and (4) whether the decedent would have eventually received the sales proceeds if he or she had lived.[6] We found that the proceeds from the contract for the sale of the calves satisfied three of these four requirements but did not satisfy the second requirement. Substantial and essential acts that the decedent had been required to perform under the contract had not been completed as of the date of his death since one-third of the calves were too young to be deliverable as of that date and had to be raised by the estate for more than 1 month thereafter. We therefore held that the sales proceeds were not income in respect of a decedent.

We now apply to the facts of this case the right-to-income test as elaborated in *Halliday v. United States, supra,* and *Estate of Peterson v. Commissioner, supra.*

General Motors had no contractual obligation as of the date of decedent's death to pay him a bonus with respect to 1969. However, the decedent had a longstanding contractual employment relationship with General Motors, and under the terms of his employment, he was eligible to participate in the bonus plan, which was a formalized deferred compensation arrangement and under which bonuses had been paid consistently in preceding years. In this factual context, it is apparent that the bonus payments were made in relation to "a legally significant arrangement" between the decedent and General Motors. See *Estate of Peterson v. Commissioner,* 74 T.C. at 639. It is also clear that decedent's 11-months employment with General Motors in 1969 and his refraining from taking any actions that would have disqualified him from bonus eligibility for that year constituted his performance of all the substantive acts required as a precondition of his being awarded a bonus for 1969. Cf. *Estate of Peterson v. Commissioner, supra.*

When Mr. Rollert died, he had no legally enforceable right to a bonus for 1969 since the bonuses for that year had not yet been declared, and General Motors had reserved the right to

---

[6]In *Estate of Peterson v. Commissioner,* 74 T.C. 630, 639 n.9 (1980), affd. 667 F.2d 675 (8th Cir. 1981), we cautioned that the four factors were not meant to be an ironclad formula but might change based on the type of transaction to be analyzed.

modify or suspend the bonus plan. However, as a practical matter, by the date of Mr. Rollert's death, and barring some unforeseen and unpredictable change in corporate plans, bonuses would be awarded for 1969. In each of the 13 years preceding 1969, General Motors had awarded bonuses. Prior to the date of decedent's death, it was anticipated that under the net earnings formula set forth in the plan, substantial funds would be added to the bonus pool for 1969. There is no evidence to suggest the committee ever considered exercising its discretion to modify or suspend the plan in 1969 or to reduce the amount added for 1969 below the amount computed under the net earnings formula. To the contrary, over 7 weeks before Mr. Rollert's death, the committee had made an initial determination of the amount available for bonuses for 1969.

It is also clear that Mr. Rollert was assured prior to his death of being one of the individuals to whom awards would be made for 1969. The committee had never denied an award to an executive vice president, and Mr. Rollert had received bonuses in excess of $300,000 for each of the 5 years preceding 1969. More importantly, over 3 weeks before Mr. Rollert's death, the committee had made a determination (albeit a tentative one) to grant bonus awards for 1969 to all executive vice presidents. The parties agree that during 1969, Mr. Rollert committed no act that would have disqualified him from receipt of an award for that year. At least implicitly, the committee recognized this fact by failing to exclude him from the executive vice president group and the possibility of forfeiture died with the decedent. Although the tentative bonus determinations were subject to monthly reviews until March 2, 1970, in point of fact, the amount formally awarded on March 2, 1970, with respect to Mr. Rollert's employment during 1969 was substantially the same as the initially determined amount, except that it was reduced by $\frac{1}{12}$th to reflect the fact that he performed no services for General Motors in December 1969.

The bonus plan provided the committee with discretion in determining the eligibility of employees for consideration for bonuses in the year their employment terminated, but the existence of this discretion did not significantly affect Mr. Rollert's chances of receiving a bonus for 1969. The committee had no written rules or guidelines circumscribing their

discretion with respect to terminated employees. However, the committee's established practice had been to make awards to terminated employees who were otherwise qualified so long as they had at least 2-months active service in the year for which the award was being granted. *Halliday v. United States, supra* at 72, paid particular attention to the fact that the corporation had consistently followed its established policy of paying post-death benefits even absent a contractual obligation. Here, it is equally clear that under established practices, the bonus award with respect to Mr. Rollert's service in 1969 would not have been denied on the basis of his cessation of employment in that year.[7] Thus, as of the date of Mr. Rollert's death, there was no material contingency comparable to that in *Keck v. Commissioner, supra*, that might have resulted in denial of a bonus award for 1969.[8] On these facts, it is established that Mr. Rollert had a substantial certainty as of the date of his death of receiving a bonus award for 1969.

Thus, the analyses in the *Halliday* and *Estate of Peterson* opinions lead us to the conclusion that as of the date of his death, Mr. Rollert had a right or entitlement to a bonus for 1969. Accordingly, the payments under the portmortem bonus award were income in respect of a decedent when received by the estate or petitioner.

### Distribution of Rights to Income in Respect of a Decedent

We must determine now whether the estate's distribution to petitioner of the rights to receive bonus installments in

---

[7]We note that had General Motors deviated from its established policy of treating terminated employees with at least 2-months service in the award year, in the same manner as continuing employees, and thereby denied decedent's bonus award for 1969, it may be that the estate could have sued to obtain the award. Compare *Hainline v. General Motors Corp.*, 444 F.2d 1250 (6th Cir. 1971), in which the court found that the bonus committee's discretion to allow terminated employees to receive accrued bonus awards was restricted by its past decisions, and for that reason, the committee could not arbitrarily deny the right to receive such accrued bonuses but must examine the facts of the particular case, with *Parrish v. General Motors Corp.*, 137 So. 2d 255 (Fla. App. 1962), in which the court held that General Motors had discretion under the bonus plan in granting or withholding bonus awards to its employee.

[8]We note that although the Sixth Circuit did not use the term "substantial certainty" in *Keck v. Commissioner*, 415 F.2d 531 (6th Cir. 1969), revg. 49 T.C. 313 (1968), the effect of the court's stressing the contingencies affecting the sale of the stock which gave rise to the liquidation proceeds shows that it took the same practical approach as the Fifth Circuit did in *Halliday v. United States*, 655 F.2d 68 (5th Cir. 1981).

subsequent years gave petitioner a basis in these rights equal to their fair market values when distributed, and whether such basis could be used by petitioner to reduce the income it received when the bonus installments were actually paid to it. This is a question of first impression.

As a preliminary matter, we address petitioner's claim that respondent is estopped from contesting its treatment of the bonus rights because of his failure to question such treatment in earlier years. Petitioner points out that respondent failed to challenge the treatment by both the estate and petitioner of the transfers of the rights to bonus installments as distributions of the estate's distributable net income in the years the rights were transferred. This argument must be rejected, first of all, because it was raised for the first time on brief. Time and again this Court has reiterated that we will not consider issues not raised in the pleadings. See, e.g., *Markwardt v. Commissioner*, 64 T.C. 989, 997 (1975); *Estate of Mandels v. Commissioner*, 64 T.C. 61, 73 (1975); *Frentz v. Commissioner*, 44 T.C. 485, 491 (1965), affd. without discussion of this issue 375 F.2d 662 (6th Cir. 1967). Furthermore, even if the issue were properly before us, it is clear there is no basis for finding estoppel against respondent, here. There is no indication that respondent ever examined the estate tax return or petitioner's returns for the prior years. Also, it is a well-established principle that the Commissioner's failure to challenge erroneous treatment of an item in earlier years does not preclude an examination of the correctness of the treatment of such item for the tax years in issue. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183 (1957); *DuPont Testamentary Trust v. Commissioner*, 66 T.C. 761, 765 (1976), affd. per curiam 574 F.2d 1332 (5th Cir. 1978).

In resolving this case, we must analyze the relationship between the rules of section 691 for the taxation of income in respect of a decedent and those of subchapter J, part I, governing the income taxation of estates. In general, the provisions of subchapter J, part I, are designed to allocate between the estate and its beneficiaries taxable income received by the estate, so that income will be taxed at only one level. For an estate that may accumulate income, such as Mr. Rollert's estate, this general allocation scheme is accomplished

through the distribution rules of sections 661 through 663. Section 691 serves a totally different purpose. It is designed to deal with the problem of how to tax income that has been earned but not received by an individual as of the date of his or her death. Under section 691, income that has accrued to a decedent prior to death but has not yet been received is not included in the decedent's final income tax return, even though the right to such income may be included on the estate's estate tax return. Instead, the income is reported when received by the person who actually receives the income. See *Estate of Sidles v. Commissioner*, 65 T.C. 873, 879 (1976), affd. without published opinion 553 F.2d 102 (8th Cir. 1977).

Here, petitioner used the distribution rules of section 662 in an attempt to reduce the income taxed to it under section 691. In effect, what petitioner did here was to report part of the payments of income in respect of a decedent as income under section 662, even before the payments were made by General Motors. When the payments were actually made in subsequent years, petitioner excluded the previously reported amounts from its section 691 income. Because the treatment of payments of income in respect of a decedent in this manner would completely undermine the mandate of section 691 that the recipient of such income report it for the year when received, we agree with respondent that petitioner had no right to reduce its income in respect of a decedent in the year it received the bonus payments by the amounts it had previously reported as income under section 662.

Section 691(a)(1)[9] provides that the amount of all items of income in respect of a decedent shall be included in gross

---

[9]Sec. 691(a)(1) provides:

(a) INCLUSION IN GROSS INCOME.—

(1) GENERAL RULE.—The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period (including the amount of all items of gross income in respect of a prior decedent, if the right to receive such amount was acquired by reason of the death of the prior decedent or by bequest, devise, or inheritance from the prior decedent) shall be included in the gross income, for the taxable year when received, of:

(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;

(B) the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; or

(C) the person who acquires from the decedent the right to receive the amount by

income, for the taxable year when received. This rule applies to income in respect of a decedent received by (A) the decedent's estate if it has acquired from the decedent the right to receive such income; (B) a person who has acquired, by reason of the decedent's death, the right to receive such income if the right to receive such income was not acquired by the decedent's estate from decedent; and (C) a person who has acquired the right to receive the amount by bequest, devise, or inheritance from the decedent, after a distribution by the decedent's estate of such right. See also sec. 1.691(a)-2(a), Income Tax Regs. In this case, subparagraph (A) required Mr. Rollert's estate to include in income amounts received with respect to those rights to bonus installments that it did not distribute to petitioner, and subparagraph (C) required petitioner to include those bonus installments that it received with respect to rights the estate had distributed to it.[10]

Under section 661(a), an estate deducts in computing its taxable income (1) any amount of income required to be distributed currently and (2) "any other amounts properly paid or credited or required to be distributed for such taxable year." However, the total amount of these deductions may not exceed the estate's distributable net income.[11] Under section 662, the beneficiary to whom these distributions are made must include in gross income a corresponding amount.[12] Sections 661(b) and 662(b) are designed to assure that the character of the amounts deducted by the estate and taken into income by the beneficiary is proportionate to the character of items entering into the computation of distributable net income.

Petitioner and the estate applied the distribution rules of

---

bequest, devise, or inheritance, if the amount is received after a distribution by the decedent's estate of such right.

[10]Sec. 691(a)(2), which requires income to be recognized upon the "transfer" of a right to receive income in respect of a decedent, does not apply to this case since "transfer" is defined specifically to exclude transfers, such as those involved in this case, to a person entitled to receive the right to income in respect of the decedent by reason of the death of the decedent or by bequest, devise, or inheritance from the decedent.

[11]Distributable net income is computed under sec. 643 by making specified adjustments to the estate's taxable income. Respondent does not challenge the correctness of the particular amounts of distributable net income reported by the estate in 1970, 1971, 1972, and 1973, the years in which rights to bonus installments were distributed.

[12]Sec. 663 lists various types of distributions that are not considered distributions subject to secs. 661 and 662, but none of the sec. 663 exclusions apply here.

sections 661 and 662 to the distribution of the rights to receive subsequent bonus installments. With respect to each bonus right it distributed, the estate deducted the entire fair market value of the right as a distribution of its distributable net income. Petitioner took this same amount into income and used it as its basis in the right to the bonus installment. The character of petitioner's income was determined under sections 661(b) and 662(b) by reference to the character of the estate's distributable net income rather than by reference to the character of the bonus, itself.

Petitioner treated section 691 as coming into play only when the actual payments of the bonus installments were made. It treated each bonus payment as income when received but only to the extent, if any, that the amount paid to it exceeded the basis it had previously assigned the bonus right.

Petitioner claims that the distribution to it of the rights to the bonus installments falls squarely within the literal language of sections 661(a)(2) and 662(a)(2) as "amounts properly paid or credited." Since the rights were irrevocably transferred to petitioner and had an acknowledged value to it at the time of distribution, which was taken into income as a distribution from the estate, the distribution appears on its face to fall within the ambit of these provisions. However, the terms "amounts properly paid or credited" would be excessively broad if read literally. Thus, these words must be interpreted in the light of the statutory framework and overall legislative objectives of subchapter J. *Mott v. United States*, 199 Ct. Cl. 127, 462 F.2d 512, 517 (1972); *Estate of O'Connor v. Commissioner*, 69 T.C. 165, 178 (1977).

In characterizing the distribution of the rights to the bonus installments as amounts properly paid or credited, petitioner placed particular reliance upon section 1.661(a)-2(c) and (f), Income Tax Regs.[13] Section 1.661(a)-2(c) specifies that the term

---

[13]Sec. 1.661(a)-2(c), Income Tax Regs., provides in pertinent part:

(c) The term "any other amounts properly paid or credited or required to be distributed" includes all amounts properly paid, credited, or required to be distributed by an estate or trust during the taxable year other than income required to be distributed currently. Thus, the term includes the payment of an annuity to the extent it is not paid out of income for the taxable year, and a distribution of property in kind (see paragraph (f) of this section). * * *

Sec. 1.661(a)-2(f), Income Tax Regs., provides:

(f) If property is paid, credited, or required to be distributed in kind:

"any other amounts properly paid or credited or required to be distributed" includes a distribution of property in kind, which petitioner believes includes the distribution here of the rights to the bonus installments. Section 1.661(a)-2(f)(2), Income Tax Regs., states that, in determining the amount deductible by the estate and includable in gross income of the beneficiary, the property distributed in kind is taken into account at its fair market value at the time it was distributed, credited, or required to be distributed.[14] There is no dispute in this case as to the fair market values of the rights on the dates of distribution. Section 1.661(a)-2(f)(3) provides that to the extent the fair market value of the property is included in a beneficiary's gross income, the beneficiary takes such amount as its basis for the property.

Respondent points out that the assigning of tax basis to the rights to income in respect of a decedent has enabled petitioner to escape income taxation on much of the income payable under those rights. In each year in which the rights to the bonus installments were distributed, the estate had distributable net income consisting primarily of bonus payments actual-

---

(1) No gain or loss is realized by the trust or estate (or the other beneficiaries) by reason of the distribution, unless the distribution is in satisfaction of a right to receive a distribution in a specific dollar amount or in specific property other than that distributed.

(2) In determining the amount deductible by the trust or estate and includible in the gross income of the beneficiary the property distributed in kind is taken into account at its fair market value at the time it was distributed, credited, or required to be distributed.

(3) The basis of the property in the hands of the beneficiary is its fair market value at the time it was paid, credited, or required to be distributed, to the extent such value is included in the gross income of the beneficiary. To the extent that the value of property distributed in kind is not included in the gross income of the beneficiary, its basis in the hands of the beneficiary is governed by the rules in sections 1014 and 1015 and the regulations thereunder. * * *

[14]In his answer to par. 6(1) of the amended petition, respondent admitted lifetime bonus installments were "property rights to income in respect of the decedent." Petitioner suggests that this is a concession by respondent that the bonus rights were "property" and thus subject to sec. 1.661(a)-2(f), Income Tax Regs. However, respondent specifically denied in the same paragraph that the transfer from the estate to petitioner resulted in an income tax basis in the bonus rights. In view of respondent's consistent argument that these rights are not subject to the distribution rules of secs. 661 and 662, because sec. 691 governs, it is clear respondent did not concede that sec. 1.661(a)-2(f), Income Tax Regs., applied to these bonus rights. We note that we are not concerned here with a dispute as to whether rights to income in respect of a decedent constitute property for sec. 661 purposes. At least in some contexts, rights to income in respect of a decedent are property for tax purposes. Indeed, sec. 1014(c) refers to "property which constitutes a right to receive an item of income in respect of a decedent," and the congressional report relating to the predecessor of sec. 691 distinguishes between the decedent's right to income and his "other property." S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 580. We simply do not reach this issue in view of our holding that sec. 691 takes precedence over secs. 661 and 662.

ly received by it in that year. The estate retained part of this income, but offset this action by distributing to petitioner rights to bonus installments that had not yet been paid to the estate. Because it treated the transfers of the rights as distributions of distributable net income, the estate's deduction for distributions of distributable net income included the date-of-distribution values of the bonus rights. The estate thereby reduced its taxable income by carrying its distributable net income out to petitioner,[15] even though it retained much of the income it had received. Petitioner increased its income in the years of distribution by taking into income the date-of-distribution values of the bonus rights, in other words, the discounted value of the future installments of income. However, by assigning basis under section 1.661(a)-2(f)(3), Income Tax Regs., to these rights, its income was reduced by the same amounts in the later years when the bonus installments were actually paid, except with respect to two installments of stock which had declined in value between the date the rights were awarded and the dates the installments were paid, in which case the reduction in income was limited by the value of the stock when the installments were paid. Thus, for the bonus rights that increased in value between the dates of distribution and receipt, the net effect of the treatment of the bonus rights by petitioner and the estate was to reduce the aggregate taxable income of the estate and petitioner by the fair market values of the bonus rights as of the dates of distribution.[16] For the two stock installments that declined in

---

[15]During 1970 through 1973, the distributions of the bonus rights were used to carry out over $400,000 of the estate's distributable net income.

[16]The following examples illustrate the escape from taxation caused by petitioner's treating the distribution of a right to income in respect of a decedent (IRD) as a distribution of distributable net income (DNI).

EXAMPLE A (right to IRD not distributed):

Fact - Year 1: Estate has DNI of $50,000. No DNI distributed.

Year 2: Estate has no DNI except for IRD of $30,000. After receiving the $30,000, estate distributed it to legatee.

Tax treatment -

Year 1: $50,000 income to estate; no income to legatee.

Year 2: $30,000 income to legatee; no income to estate.

value during this period, aggregate taxable income was reduced by the values of the stock when paid to petitioner.

We therefore agree with respondent that the approach taken by petitioner and the estate allowed substantial sums of income to escape taxation.[17] Section 691 and its legislative history evince a clear purpose to tax income in respect of a decedent in the same manner as if it had been received by the decedent. Allowing the escape from taxation suggested by petitioner would undermine this purpose. In this respect, we believe the following language from *Commissioner v. Linde*, 213 F.2d 1, 5–6 (9th Cir. 1954), which we quoted with approval

---

EXAMPLE B (*right to IRD distributed in year 1 and treated as DNI distribution*):

Facts - *Year 1*: Estate has DNI of $50,000. No DNI distributed except that right to IRD payable in year 2 is distributed to legatee. Present value of this right to IRD is $28,000.

*Year 2*: Estate has no DNI. The $30,000 of IRD is paid directly to legatee.

Tax treatment -

*Year 1*: $22,000 income to estate; $28,000 income to legatee.

*Year 2*: No income to estate; $2,000 income to legatee (i.e., $30,000 IRD minus basis of $28,000).

COMPARISON:

|  | Income to estate | Income to legatee | Aggregate income to estate and legatee |
|---|---|---|---|
| Example A | $50,000 | $30,000 | $80,000 |
| Example B | 22,000 | 30,000 | 52,000 |
|  |  |  | 28,000 (Amount escaping taxation) |

[17]Commentators who have examined the tax consequences of an estate's distribution of rights to income in respect of a decedent have generally recognized that application of the distribution rules of secs. 661 and 662 would allow substantial sums to escape taxation. But they also recognize that a literal reading of secs. 661 and 662 and the regulations thereunder would allow this result. Some of the commentators believe these provisions of the Code and regulations must be interpreted as inapplicable to the distribution of rights to income in respect of a decedent. See 2 A. Casner, Estate Planning 804–805 (1980); M. Ferguson, J. Freeland & R. Stephens, Federal Income Taxation of Estates and Beneficiaries 533–534 (1970); Rammel, " 'Income in Respect of Decedent' Provisions Lend Themselves to Postmortem Estate Planning," 7 Tax'n for Acct. 358, 361 (1971). Others have concluded, however, that the distribution of the rights to income in respect of a decedent should be accepted as "amounts distributed" for purposes of secs. 661 and 662. See Quigley, "The IRS's Position on Income in Respect of a Decedent," 121 Tr. & Est. 15 (1982); Wilf, "Planning for Distributions of Property-in-Kind After the Tax Reform Act," 12 Inst. on Est. Plan., sec. 1612 (1978); "Income in Respect of a Decedent," 5 Real Prop. Prob. & Tr. J. 307, 309 (1970).

in *Estate of Sidles v. Commissioner*, 65 T.C. 873, 879 (1976), affd. without opinion 553 F.2d 102 (8th Cir. 1977), is instructive:

> there is nothing in the legislative history or in the text of Sec. 126 [the 1939 I.R.C. predecessor to section 691] to indicate that it was intended to be anything other than an improved device to accomplish the general purpose of the internal revenue code that all income should pay a tax and that death should not rob the United States of the revenue which otherwise it would have had. * * * [Fn. ref. omitted.]
>
>            *       *       *       *       *       *       *
>
> it is our view that section 126 was but an improved method adopted by Congress in aid of its continuing effort to avoid the loss of tax upon income merely because of the death of the decedent who would have paid a tax upon the same economic returns had he lived to receive them.

Petitioner would have us accept its taking into income under section 662(a) the value of the bonus rights when distributed as satisfying the objective of section 691 to tax all income in respect of a decedent to the actual *recipient* of the income. Petitioner is correct that the overall amount of income reported by it under either section 662(a) or section 691 was similar to the amount it would have reported had it not treated the receipt of the rights to future bonus installments as distributions of the estate's distributable net income. However, as we have explained above, the aggregate amount of income reported by the estate and petitioner was substantially reduced by petitioner's approach since the distributions of the rights to future bonus installments were treated as carrying out to petitioner the estate's distributable net income. The estate thereby reduced its reported income and was able to accumulate funds which could subsequently be paid out, tax-free, to petitioner, the residuary legatee.

For this reason, we do not believe that petitioner's reporting income under section 662 when it received the rights to subsequent bonus installments should be treated as satisfying the requirement that the *recipient* report all income in respect of a decedent. Furthermore, even if we were to assume that petitioner's treatment of the bonus rights and installments satisfied the requirement of section 691 that income in respect of a decedent be taxed to the recipient of such income, we see no way that it could also satisfy the timing and characterization rules of that section.

Section 691(a)(1) requires income in respect of a decedent to

be included in income "for the taxable year when received." It is designed to defer taxation of these amounts until actual receipt. Were we to accept petitioner's view that its reporting income when the rights to bonus installments were distributed satisfied the objective that it be taxed on the income in respect of a decedent, it would be apparent that the timing rule had been violated. Under petitioner's approach, the only income deferred until actual receipt would be the excess of the amount received over the amount reported in the year the right was distributed.

Section 691(a)(3) requires the character of income in respect of a decedent to be the same as it would have been in the hands of the decedent if the decedent had lived and received such income. Here, however, only that income actually reported in the year of receipt as income in respect of a decedent took its character under section 691(a)(3). The character of the rights to income in respect of a decedent that were distributed was determined under section 662(b) by reference to the character of the estate's distributable net income. Thus, it is apparent that petitioner's approach would also cripple the characterization rule for income in respect of a decedent.

It is a well-accepted principle of law that a specific statute controls over a general one, even if the latter might otherwise appear to govern. *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961); *Estate of O'Connor v. Commissioner, supra* at 178; *Essenfeld v. Commissioner*, 37 T.C. 117, 122–123 (1961), affd. 311 F.2d 208 (2d Cir. 1962). As we have explained, there is an apparent conflict between section 691 and the distribution rules of sections 661 and 662. In view of the nature of section 691 as a specific statutory scheme for the taxation of income in respect of a decedent, which would be largely defeated were rights to income in respect of a decedent allowed to acquire basis under the distribution rules, we believe section 691 must take precedence, here.

Although the legislative history of section 691 and the regulations under that section do not specifically address the issue presented in this case, they do tend to support our conclusion that sections 661 and 662 should not be applied to an estate's distribution of rights to income in respect of a decedent. Example 1 of section 1.691(a)-2(b), Income Tax Regs., which illustrates the application of the general principle of

taxing income in respect of decedent, when received, involves a fact situation quite similar to that now before us. A decedent was entitled to salary payments in five annual installments after his death. The estate collected the first two payments and then distributed to the residuary legatee the right to the remaining three installments. The example states that the estate must include the first two installments in its gross income and the legatee must include the subsequent three installments in his gross income. This example does not even refer to the possibility of the right to the final three installments being treated as a distribution governed by sections 661 and 662. If the distribution rules were meant to apply to distributions of rights to income in respect of a decedent, the absence of any reference to this effect in the regulation is incomprehensible.

The current rules in section 691 for the taxation of income in respect of a decedent are derived primarily from section 126, I.R.C. 1939, which was added by section 134 of the Revenue Act of 1942, 56 Stat. 831. The legislative history of that provision clearly states Congress' intent that amounts of income in respect of a decedent—

be treated, in the hands of the persons receiving them, as income of the same nature and to the same extent as such amounts would be income if the decedent remained alive and received such amounts. [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 580.]

At several points, the Senate report indicates the provision was designed to place the recipient of the income in respect of a decedent in the *same position* as the decedent with respect to both the amount and character of income. Nothing in the legislative history of the Internal Revenue Code of 1954, which introduced the distribution rules of sections 661 and 662, indicates any congressional desire to change the requirement that income in respect of a decedent be taxed in the same manner as it would have been treated if it had been received by the decedent, himself. The decedent would normally report for tax purposes each installment as received, with the full

installment being included as income. The provisions of the legislative history cited by petitioner[18] do not indicate otherwise. All that these provisions are concerned with is the general rule of sections 661 and 662 that all distributions are deductible by the estate and includable by the beneficiary when distributed. They do not deal, however, with the question before us now of whether a distribution of rights to income in respect of a decedent is a distribution subject to sections 661 and 662.

Contrary to petitioner's contention, the changes made when the Internal Revenue Code of 1954 was enacted actually support respondent. H. Rept. 1337, 83d Cong., 2d Sess. 64, A218-A219 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 87–88, 373–374 (1954). Congress extended section 691(a)(1) so that it applies to rights to income in respect of a prior decedent that are acquired by a beneficiary from a second decedent. As an example of how this provision works, the committee reports mention a widow who was entitled to receive insurance renewal commissions but who died before receiving such commission income. Under the pre-1954 law, the fair market value of the right to receive the commissions had to be included in the widow's final income tax return, even though she left to her son the right to receive the commissions. Congress explained that section 691 was being expanded so that no income would be realized on the transfer to the widow's estate of the right to income from the prior decedent. The commissions earned by the prior decedent should be taxed to the recipient upon receipt and their character determined by reference to the prior decedent. These results outlined in the reports under the post-1954 law could not be obtained if petitioner's theory were accepted, since petitioner would treat the distribution from the estate of the prior decedent to the widow as a distribution of a right to income in respect of a decedent, which would require the widow to recognize income and would create a basis in the right to receive future commissions. The rights to the commission income had necessarily been distributed from the estate of the prior decedent to the widow, and under petitioner's theory, the widow would

---

[18]H. Rept. 1337, 83d Cong., 2d Sess. 60, A198 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 84, 348 (1954).

have reported the fair market value of such rights when they were distributed to her and taken such value as her basis in the rights. Nowhere do the committee reports even intimate that this might be the proper treatment.

We address finally petitioner's contention that its treatment of the bonus rights did not defeat the overall scheme of section 691, since section 1.661(a)-2(f), Income Tax Regs., forgives any income tax on the appreciation in value of property in kind distributed by an estate or trust.[19] It is apparent that this regulation does cause the nonrecognition of some unrealized appreciation. However, there are several key distinctions between the nonrecognition sanctioned by this regulation and the situation before us now. First of all, petitioner has assumed that the difference between the value of a right to income in respect of a decedent and its basis can properly be labeled as appreciation. However, the right to income in respect of a decedent is the right to compensation income, which was already earned by the decedent and became nonforfeitable upon his death. This is simply income that has been earned but not yet reported, and thus cannot be seen as constituting appreciation in the value of property. Any increase in the value of bonus rights resulted from the fact that they were initially discounted because of the delay that had to be borne until the recipient could actually enjoy receipt of the income.

More importantly, petitioner's analogy to appreciated property is misplaced because it fails to consider that section 1014(a) generally allows a step-up in basis to the date-of-death valuation for property acquired from a decedent, while section 1014(c) denies a basis step-up for rights to income in respect of a decedent. Petitioner's approach would allow an escape from income taxation for all income in respect of a decedent represented by the value of the right to such income when distributed. This would have the effect of allowing a step-up in basis for increases in value of rights to income in respect of a decedent occurring before the decedent's death, as well as those occurring between the date of death and the date of distribution. Thus, petitioner's interpretation of section

---

[19]See generally M. Ferguson, J. Freeland & R. Stephens, Federal Income Taxation of Estates and Beneficiaries 525-533 (1970).

1.661(a)-2(f), Income Tax Regs., sees respondent as having allowed by regulation what was specifically denied by statute under section 1014(c), i.e., a step-up basis to the date-of-death value for rights to income in respect of a decedent.

We hold as a general principle that section 691 overrides sections 661 and 662 and precludes the assignment of a basis to a right to income in respect of a decedent when that right is transferred by an estate to a legatee. Therefore, we find in this case that petitioner improperly offset against its income in respect of a decedent, basis previously assigned to the rights to the bonus installments. Because the lifetime bonus installments were included in the gross estate, in computing petitioner's income tax liability relative to the contested bonus installments, a deduction under section 691(c) should be allowed for the Federal estate tax the estate paid with respect to the rights to these installments.

*Decision will be entered under Rule 155.*