PETER S. RUBIN AND GAIL A. RUBIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rubin v. Commissioner
Docket No. 17490-86.
United States Tax Court
T.C. Memo 1989-290; 1989 Tax Ct. Memo LEXIS 290; 57 T.C.M. (CCH) 706; T.C.M. (RIA) 89290; June 14, 1989. Peter S. Rubin, pro se. James C. Fee, Jr., for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency
1981
$ 2,627.66
1982
3,121.68
1983
2,632.00
1984
1,008.00
By motion to amend the answer to conform to the proof at trial, respondent seeks additional deficiencies in petitioners' Federal income taxes as follows: Additional
Total Original and
Taxable Year
Deficiency
Additional Deficiency
1981
$   395.00
$ 3,022.66
1982
291.00
3,412.68
1983
4,257.91
6,889.91
1984
5,040.25
6,048.25
*292 After concessions, the issues for decision are (1) whether petitioners' Amway products distributorship activity constituted a trade or business or an "activity not engaged in for profit" within the meaning of section 183(a), [1] and (2) whether respondent may amend his answer to seek increased deficiencies and, if so, whether there are increased deficiencies due from petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by reference. Petitioners, Peter S. Rubin ("Mr. Rubin") and Gail A. Rubin ("Mrs. Rubin"), are husband and wife who resided in Cherry Hill, New Jersey, when their petition was filed. On their tax returns for the taxable years in issue, Mr. Rubin's occupation was reported as "sales" or "sales management," and Mrs. Rubin's occupation was reported as "real estate broker." Throughout all of taxable years 1981 and *293 1982 and during part of taxable year 1983, Mr. Rubin was employed by various transportation equipment leasing companies. From May 1983 through February 1985, he was not employed full-time by any one of those companies, but he earned substantial brokerage fees and finders fees from Interstate Truck Sales. During that period, he also began installing security alarm systems. In February 1985, Mr. Rubin became a new and used car sales manager at Charles Oldsmobile. Mrs. Rubin maintained full-time employment as a broker for Maffucci Realty, Inc., during the years in issue. For each of the taxable years in issue, petitioners filed with their Federal income tax return a Schedule C bearing the name "GPR Associates." From taxable year 1981 through taxable year 1984, petitioners claimed losses from GPR Associates on the Schedules C as follows: Taxable Year
Loss
1981
$ 8,276.00
1982
7,595.05
1983
8,588.00
1984
3,204.00
The "Main Business Activity" and "Product" spaces on the GPR Associates Schedule C for the taxable years in issue were filled in as follows: Taxable Year
Main Business Activity
Product
1981
Distributor
Amway
1982
Distributor
Varied-Amway
1983
Marketing and Motivation
Varied
1984
Marketing and Distribution
Varied
*294 Mrs. Rubin had become an Amway distributor in July 1981. Mr. Rubin became an Amway distributor in May or June of 1984. For the taxable years in issue, petitioners' combined gross incomes, excluding unemployment compensation, unearned income, and the Amway products distributorship activity, were as follows: Taxable Years
1981
1982
1983
1984
Mr. Rubin
Wages, Commissions, and Fees
$ 31,082
$ 27,909
$ 28,101
$  6,647
Mrs. Rubin
Wages and Real Estate
Commissions
20,796
24,092
36,758
58,972
Total Earned Gross Income
$ 51,878
$ 52,001
$ 64,859
$ 65,619
Mr. Rubin also collected unemployment compensation in the amounts of $ 5,116 and $ 1,414 during taxable years 1983 and 1984, respectively. For taxable years 1981 through 1984, petitioners' Amway products distributorship activity, distinguishing between alarm and non-alarm sales, is summarized as follows: Taxable Years
1981
1982
1983
1984
Receipts
Retail
$     -0- $  1,168 $   1,419 * $  21,314 Downline
3,004 6,018 5,584 13,259 Total Receipts
$   3,004 $  7,186 $   7,003 $   34,573 Less: Cost of Goods
Sold **
4,410 9,693 9,026 31,247 Gross Profit (Loss)
$  (1,406)
$ ( 2,507)
$ ( 2,023)
$   3,326 Less: Net Income from
Alarm Installation
Sales
-0- -0- -0- [2] 5,249 Gross Profit (Loss)
$  (1,406)
$ ( 2,507)
$ ( 2,023)
$ ( 1,923)
Plus: Commission Income
181 1,102 1,027 3,570 Gross Income (Loss)
$  (1,225)
$ ( 1,405)
$ (   996)
$   1,647 Less: Expenses
Advertising
62 -0- -0- 367 Car and Truck
678 777 5,395 6,805 Commissions
2,686 304 46 1,455 Dues and Publications
747 431 -0- 102 Office Supplies,
Postage and Freight
282 448 1,411 1,422 Travel and
Entertainment
1,108 2,071 6,685 5,088 Meeting Room and
Chairs
53 -0- -0- -0- Meeting Fees,
Seminars, Rallies
104 -0- 1,119 843 Utilities and Telephone
-0- 596 1,086 600 Home Office and Storage
1,331 1,563 1,717 -0- Bank Charges
-0- -0- -0- 64 Total Expenses
$   7,051 $   6,190 [2] $  17,459 [2] $  16,746 Net Loss
$  (8,276)
$ ( 7,595)
[2] $ (18,455)
$ (15,099) ** Cost of Goods Sold:
Purchases
$   5,274 $  12,116 $  12,035 $  21,882 Plus alarm parts
-0- -0- -0- 15,666 Total Purchases
5,274 12,116 12,035 37,548 Less: Personal Use
864 2,423 3,009 3,181 Closing Inventory
-0- -0- -0- 3,120 Cost of Goods Sold
$   4,410 $   9,693 $   9,026 $  31,247 *295 Petitioners maintained no ledgers in connection with their Amway product distributorship activity during the taxable years in issue. At the end of each of the years in issue, petitioners merely added the amounts of their checks, invoices, receipts, and Amway order forms for purposes of reporting income and expenses on the Schedule C of their tax return. Petitioners' expenditures for their Amway products distributorship activity were made from their personal checking accounts until 1984, when they opened a separate checking account for such expenditures. Petitioners maintained diaries showing the names of individuals with whom petitioners shared the Amway sales and marketing plan. Petitioners' diaries generally, however, do not include entries which reflect the time, place, or business purpose of any meetings with or entertainment of individuals named in the diaries. Furthermore, the diaries do not reflect the business relationship of any of those individuals to petitioners. Petitioners deducted $ 2,686 *296 for cash payments made to their children during 1981, and reflected those amounts as "commissions" on their GPR Associates Schedule C for 1981. Petitioners maintained no records in support of that deduction. Petitioners claimed deductions on their Schedules C for telephone expenses. Petitioners computed their telephone expenses by subtracting the basic monthly charge for telephone service from their telephone bill and claiming the balance as a deduction. Petitioners made no further computations to account for long distance charges relating to any personal usage. Petitioners claimed deductions for storage and a home office on their Schedules C for the years in issue. The amounts claimed by petitioners represent the expenses associated with one room, or approximately one-eighth, of their personal residence during the years in issue. Petitioners claimed travel and entertainment deductions for the cost paid for numerous meals during the taxable years in issue. Such expenditures included the cost of food when Mr. Rubin dined alone in local restaurants and fast food establishments. During taxable years 1981 through 1983 and part of taxable year 1984, petitioners maintained little *297 or no inventory of Amway products, but they did maintain Amway pamphlets and tapes. Petitioners made no written projections for profit, loss, or break-even with regard to the Amway products distributorship activity during the taxable years in issue. Petitioners measured their profit potential by the number of individuals recruited as distributors. Petitioners often gave complimentary Amway products to individuals with whom they discussed Amway, but they kept no record of the items given away or to whom they were given. Petitioners sponsored 13 individuals who became Amway distributors from 1981 through the date of trial. Promotional literature provided to prospective Amway distributors states that an individual does not need special skills to engage in an Amway products distributorship activity and that a distributor could achieve financial independence in two to five years. In addition, Mr. Rubin told prospective distributors that it takes ten to fifteen hours per week over a three to five year period to become successful in an Amway products distribution activity. The Amway promotional literature claims that distributors potentially could save $ 1,500 or $ 2,000 per year *298 on items used personally. Amway distributors are able to purchase products from their "up-line distributors" with an average discount of about 30 percent from the suggested retail price. Gross income for Amway distributors is based on retail sales and performance bonuses. Points leading to performance bonuses are based on both retail sales and personal consumption of the Amway products. During the years in issue, petitioners sold $ 2,988 of Amway non-alarm products at retail and used $ 9,477 of Amway products for personal use. According to surveys performed for Amway, the average monthly gross income (retail margin plus performance bonus) for "active" distributors was $ 67 for the period surveyed February 1980 through January 1981, and $ 76 for the period surveyed May 1984 through April 1985. An "active" Amway distributor is defined in those surveys as one who has paid his annual $ 15 renewal fee and attempted to make a retail sale, presented the Sales and Marketing Plan, received bonus money, or attended a company or distributorship meeting in the month surveyed. During the periods of those surveys, 38 to 40 percent of all Amway distributors were defined as "active." Respondent *299 filed a motion subsequent to the trial of the instant case to amend his answer to conform to the proof. Respondent's motion states that he was misled by petitioner's presentation of all income and expenses from three separate activities in one combined GPR Associates Schedule C for taxable years 1983 and 1984. Respondent asserts that such a presentation led to the erroneous disallowance of only the net combined losses of the three activities, instead of disallowance of the loss from each unprofitable activity without offset for the amount of profits from each profitable activity. Respondent also alleges that the notices of deficiency for taxable years 1981 and 1982 erroneously disallowed only the expenses portion of petitioners' net Schedule C losses for those years, without disallowing the excess of cost of goods sold over gross receipts. Accordingly, respondent asserts that the full amount of the claimed losses for the years 1981 through 1984 ($ 8,276.00, $ 7,595.05, $ 18,555.00, and $ 15,099.00, respectively) should be disallowed under section 183. OPINION Respondent contends that section 183 disallows all deductions attributable to petitioners' Amway products distributorship *300 activity. Section 183(a) supplies the general rule which disallows all deductions attributable to activities "not engaged in for profit." Section 183(b)(1) then allows those deductions otherwise allowable regardless of profit motive, e.g., interest and State and local taxes. In addition, section 183(b)(2) allows those deductions which would have been allowable had the activity been engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). Respondent argues that petitioners' Amway products distributorship activity was "not engaged in for profit" and that, therefore, deductions taken by petitioners for taxable years 1981 through 1984 which are attributable to that activity must be disallowed to the extent they exceed gross income from the activity. Petitioners contend that they commenced and continued their Amway products distributorship activity with the requisite profit objective. Thus, petitioners argue, section 183 is inapplicable, and the deductions attributable to that activity are fully deductible. *301 We must decide whether section 183 applies to petitioners' Amway products distributorship activity. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Thus, section 183 does not apply if petitioners' Amway products distributorship activity gives rise to deductions under section 162 or under section 212(1) or (2). Deductions are permitted under those sections if an activity is commenced and continued with the "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). *302 Petitioners need not, however, establish that they had a "reasonable" expectation of profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. Whether petitioners had the requisite intent is an issue of fact to be resolved on the basis of all of the facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Dreicer v. Commissioner, supra at 645. In making our determination, we give greater weight to objective factors than to petitioners' statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Giving due regard to the aforementioned precepts, we conclude that petitioners have failed to prove that they possessed the requisite profit objective. Therefore, section 183 applies to the deductions at issue. *303 Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of nine factors, derived from case law, to be considered in determining whether an activity is engaged in for profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Benz v. Commissioner,63 T.C. 375, 382-383 (1974). The factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative, and all facts and circumstances, including factors not listed, are to be considered. Sec. 1.183-2(b), Income Tax Regs. *304 ; Abramson v. Commissioner,86 T.C. 360, 371 (1986). The expertise of petitioners and their advisors is a factor in deciding whether profit objective is present. Sec. 1.183-2(b)(2), Income Tax Regs. Mr. Rubin testified that petitioners tried to build their business in conformity with Amway's recommendations and the instruction provided by their up-line sponsors. Petitioners, however, did not offer any evidence to show what kind of advice was provided to petitioners. The Amway literature claims that financial independence can be obtained within two to five years. Yet, there is no indication that petitioners sought advice to determine why they fell short of those expectations. Petitioners were experienced sales persons, and we normally might consider such expertise a factor in petitioners' favor. Mr. Rubin, however, testified that such skills are actually detrimental to a successful Amway products distributorship. In either event, we do not consider petitioners' other sales expertise as a significant factor in our decision. We also consider the time and effort expended by petitioners in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. *305 Petitioners spent substantial amounts and took substantial deductions for entertainment, which suggests that much of their personal time was devoted to the Amway products distributorship activity. Mr. Rubin testified that he spent three to four nights a week in pursuit of the activity. Like the taxpayers in Elliott v. Commissioner,90 T.C. 960, 973 (1988), however, petitioners have made no showing that their activities extended beyond maintenance of an active social schedule. The financial status of petitioners is also relevant. Sec. 1.183-2(b)(8). Petitioners assert that because they held positions which afforded them the opportunity to claim tax deductions other than those claimed in connection with the Amway products distributorship activity, they did not need to use the Amway activity for additional tax deductions. We disagree. The record in the instant case does not convince us that petitioners used Amway as a medium other than to claim tax deductions for personal expenditures made for their home, social engagements, travel, and payments to their children. Further, petitioners offered no evidence that any assets used in the activity were expected to *306 appreciate ( section 1.183-2(b)(4), Income Tax Regs.), that they successfully had carried on similar activities in the past ( section 1.183-2(b)(5), Income Tax Regs.), or that they had a history of profits ( section 1.183-2(b)(6), Income Tax Regs.). Another factor listed in the regulations is the element of personal pleasure or recreation involved in the activity. Sec. 1.183-2(b)(9). Respondent contends that petitioners' Amway products distributorship activity was motivated by the opportunity to purchase consumer goods at sizable discounts as well as the ability to claim tax deductions for personal expenses. In response, petitioners rely on the testimony of their witnesses, De Monso Waters and Armand Bagatta. [3] Although Mr. Waters and Mr. Bagatta testified that they became involved with Amway to make money, their testimony lends little support to petitioners' arguments. To the contrary, both witnesses acknowledge the personal benefits gained from Amway product distributorship activities. Mr. Bagatta explained that distributors receive a 30 percent discount on products consumed in their own household, *307 referring to this discount as the "immediate gross profit." Mr. Waters testified that in addition to being able to supply his home with the discounted Amway products, he also gained friends and a "family type of unity" through Amway. We further note that, during the taxable years in issue, petitioners' personal usage of Amway products was more than three times the level of their retail sales of such products. Considering petitioners' personal usage of Amway products, along with their substantial entertainment deductions and the testimony of Mr. Waters and Mr. Bagatta, we are not convinced that petitioners' Amway products distributorship activity provided merely incidental elements of recreation and other personal pleasure and benefit. The manner in which petitioners carried on their Amway products distributorship activity ( sec. 1.183-2(b)(1), Income Tax Regs.), however, is the most telling indication that they were not engaged in the activity with the requisite profit objective. *308 The regulations cite complete and accurate recordkeeping as indicative of an activity engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. In Elliott v. Commissioner, supra, a recent opinion deciding that the taxpayers did not engage in an Amway products distributorship activity with the intent to make a profit, we focused on the unbusinesslike manner in which the taxpayers' activity was conducted. Of particular concern was the "cursory and sloppy fashion" in which the taxpayers kept their records. Elliott v. Commissioner, supra at 971-972. In the instant case, petitioners' records consisted primarily of cancelled checks from their personal checking account, loose invoices, credit card receipts, Amway order forms, and entries in diaries, none of which ever was recorded in ledgers. Those documents were summarized only at the end of each year for the purpose of transcribing the information onto petitioners' tax return for that taxable year. During the taxable years at issue, petitioners kept no record of how much product was sold, *309 given away, or used personally. Moreover, petitioners had no summaries or reports to evaluate the success or failure of their efforts during the year. Although Mr. Rubin testified that he had numerous meetings with prospective customers or distributors, petitioners kept no written account of the nature and results of their meetings, the strategies and sales methods used during these meetings, or whether any methods implemented had been successful. Petitioners' diaries contain little more than names of individuals whose association with petitioners generally cannot be determined from the evidence contained in the record. Further, petitioners offered no corroborating evidence that would show the purpose and nature of the numerous out-of-town seminars which they attended. As an excuse for the manner in which their Amway products distributorship activity was conducted, petitioners assert that they lacked the necessary knowledge during the early years of their distributorship activity. They argue that as their experience progressed over the years, they kept better records. While we accept that petitioners lacked knowledge of Amway procedures when they first became involved with *310 Amway, we do not believe they lacked the level of business sophistication necessary to keep proper records. Because petitioners were experienced salespersons when they first entered into the Amway products distributorship activity, we decline to accept petitioners' excuse. Their experience with their other businesses should have taught petitioners the importance of recordkeeping. The regulations also state that "a change of operating methods * * * or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners argue that they changed their operating methods as they went forward with the activity. However, the only indication of that sort is the opening in 1984 of a checking account in the name of GPR Associates. We do not believe that opening a checking account is the sort of activity to which the regulation provision refers when it speaks of "a change of operating methods * * * or abandonment of unprofitable methods." By taxable year 1984, *311 petitioners' activity still had not produced a profit. In short, we agree with respondent that "petitioners maintained records in much the same fashion as that described by the Court as 'cursory and sloppy' in Elliott v. Commissioner, supra." The thin line between the business and personal elements of petitioners' Amway products distributorship activity causes us to require more concerned and detailed recordkeeping than that evinced by petitioners before we will find that the manner in which the activity was carried on is satisfactory. If petitioners truly had been concerned about making a profit, we think they would have kept records better suited to allowing them to evaluate the success of their Amway products distributorship activity. [4] See Elliott v. Commissioner,90 T.C. at 972. Based upon the foregoing, we find that petitioners have failed to prove that their Amway products distribution activity was entered into with the requisite objective of making a profit. We hold that petitioners therefore are liable for the deficiencies determined by respondent in the notices of deficiency. *312 We next must decide whether respondent may amend his answer in the instant case to seek increased deficiencies. Respondent first raised the issue of the increased deficiencies in his motion to amend the answer to conform to the proof at trial. Respondent contends that petitioners, on their tax returns, offset the deductions from their Amway product distributorship activity against substantial other income not related to that activity. Respondent argues that he has raised no new theory of liability in the instant case, but merely seeks additional deficiencies from petitioners because income allegedly unrelated to the Amway products distributorship activity was combined with and erroneously offset by deductions from the Amway products distributorship activity that otherwise would not be allowable under section 183. In response to respondent's motion, petitioners argue that they would be prejudiced if respondent were allowed to amend his answer after the trial because they would not have the opportunity to offer evidence on the issue of whether the income shown and deductions taken on the Schedules C were related to not just one, but a number of activities. Respondent replies *313 that there is no element of surprise with respect to the amendment because much of the evidence upon which he relies in his motion is contained in the stipulation of facts, which was "the product of conferences between the parties." We do not agree with respondent's argument. It is evident that respondent possessed the evidence prior to trial, given his assertion that the stipulations upon which he now relies were the product of pre-trial conferences between the parties. We believe that the proper time for respondent to have moved to amend the answer was before the trial. Inasmuch as respondent's trial memorandum and opening statement make no mention of the additional deficiencies, it is clear that he did not raise the matter before trial, even though the evidence upon which respondent relies was in his possession. Respondent also relies on Rule 41(b) which provides that when issues not previously raised are tried with the express or implied consent of the parties, the pleadings may be amended to conform to the evidence. We can find no indication, however, of any "consent" on petitioners' *314 part, other than the fact that some, but not all, of the evidence necessary to decide the issue of the additional deficiencies was presented at trial. Respondent, represented by counsel, and petitioners, pro se, each submitted a trial memorandum in which the issue of the additional deficiencies was not raised. It therefore is clear to us that petitioners did not consent to the raising of the issue of the additional deficiencies. The record is devoid of any facts which would lead us to conclude that petitioners had any knowledge of respondent's contentions that some of the income reported on the GPR Associates Schedules C was unrelated to the deductions taken on those schedules. The contentions raised in respondent's motion appear by all accounts to be a new theory, despite respondent's opposite characterization. Because petitioners were not given notice of respondent's new theory, they were denied the opportunity to prepare their case for trial on that theory. We conclude that to allow respondent's amendment would prejudice petitioners and violate fundamental fairness. Markwardt v. Commissioner,64 T.C. 989, 997-998 (1975); Ross Glove Co. v. Commissioner,60 T.C. 569, 595 (1973). *315 See also Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975). Respondent's motion to amend his answer therefore will be denied. An appropriate order will be issued, and a decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Includes $ 20,914 of alarm installation sales. ↩
2. We have corrected these figures for obvious addition and transposition errors in the tax returns or stipulation.↩
3. Mr. Waters did not become associated with Mr. Rubin until after the taxable years in issue. Mr. Bagatta did not become an Amway distributor until taxable year 1984.↩
4. See Mulvaney v. Commissioner,T.C. Memo. 1988-243↩.